JAMES A. WILLIAMS v. CHARLES E. SCHAFF, Receiver of Missouri, Kansas & Texas Railway Company, Appellant.

Division One, June 2, 1920.

1. NEGLIGENCE: Injury on Way to Work: Lodging in Another Town: Necessity: Sufficient Evidence. Where plaintiff was ordered to go to Savannah to assist a foreman in the construction of a semaphore and not having finished the work at quitting time and intending to finish it the next day, the foreman said "there isn't any place to stay in Savannah; we will run up to McAlester and return

282 Mo.—32

tomorrow morning," and thereupon they took a train for Mc-Alester and the next morning, at seven o'clock, the hour at which the day's work began, went to the station and waited till eight o'clock and then attempted to board a passing train, in which attempt plaintiff was injured, he and the foreman were not acting within the scope of their employment after they went to the station at seven o'clock if they left Savannah on an errand of their own, but only in the event plaintiff had been forced to go to McAlester in consequence of inability to procure accommodation for the night at Savannah; but plaintiff being unacquainted in Savannah, and the only evidence on the question being plaintiff's testimony that the foreman said there was no place to sleep in the town, that testimony, being received without objection, tended to prove the necessity of seeking lodging elsewhere, and nothing appearing to indicate McAlester was not as accessible as any other place, the question whether he and the foreman were engaged in the railroad company's service on their way back to their task after the hour for them to resume work had arrived, fairly presented by instructions given, is settled by the verdict of the jury.

*Held*, by GRAVES, J., dissenting, that the necessity for the trip to McAlester is not sufficiently shown and the evidence is entirely too shadowy to form a basis for defendant's liability.

2. ———: ———: **Necessary Absence: Rule.** In such a case, the liability of an employer for injury to a workman in his service while absent from the place of his task depends on whether the workman's absence is voluntary and of his own choice or involuntary and compelled by conditions.

3. ———: **Interstate Commerce: Replacement of Semaphore: Federal Employers' Liability Act.** An employee engaged in constructing a new semaphore to take the place of an old one still in use, used for signaling both interstate and intrastate trains on the line of an interstate railroad, is not engaged in interstate commerce, and his action for damages for personal injuries while so engaged is not within the provisions of the Federal Employers' Liability Act, which makes a common carrier "liable in damages to any person suffering injury while he is employed in such commerce."

4. ———: ———: **Repair and Construction.** The fact that the new semaphore, being constructed to take the place of an old one, was to be used in both intrastate and interstate commerce, did not make the employee's act of construction an employment in interstate commerce, for the new semaphore was not at the time in use in any kind of commerce.

5. ———: ———: **Federal Employers' Liability Act: Contributory Negligence.** If plaintiff at the time of his injury was not engaged in interstate commerce and his action is tried as though it was within the scope of the Federal Employers' Liability Act and a

verdict rendered for him, the case must be retried on the common-law count instructed against, unless, in the trial, the rules of law relating to contributory negligence and assumption of risks as declared by the courts of this State, are observed; for the liability of a common carrier under the Federal Act, where the issue of contributory negligence or assumption of risks is present, is not the same as it is under the rules of this State relating to those defenses.

6. ———: ———: ———: Instruction Against Common-law Liability: Waiver. The fact that the trial court, at defendant's request, instructed against a verdict on the common-law liability alleged in the second count, does not preclude defendant's right to say that no recovery can be had under the Federal Employers' Liability Act pleaded in the first count, where defendant at the trial requested separate charges that he could not recover on either count.

7. .———: Free Pass: Trespasser: Relevant Evidence. Under the facts of this case, plaintiff who rode on a freight train, on a free pass issued to a foreman "and one man," apparently "not good on freight trains," was not a trespasser. But being at all times in the possession of the foreman, the free pass was admissible in evidence, since it bore upon the issue of plaintiff's contributory negligence and assumption of the risk in attempting to board the freight train, and upon the foreman's authority to direct him to board.

8. ———: ———: Instruction: Comment. The instruction concerning a free pass should be confined to the issues which make it admissible as evidence. and should not be so drawn as to magnify its importance and confuse the jury regarding issues to which it is not relevant.

Appeal from Pettis Circuit Court.—*Hon. Hopkins B. Shain*, Judge.

REVERSED AND REMANDED.

*J. W. Jamison, Montgomery & Montgomery* and *Carl S. Hoffman* for appellant.

(1) In beginning the work of constructing a new semaphore that had not been used and was not being used, and in no event could be used until completed, plaintiff was not engaged in interstate commerce. Bravis v. Milwaukee Railroad, 133 C. C. A. 228; Raymond v. Mil-

waukee Railroad, 147 C. C. A. 245, 243 U. S. 43; New York Central Railroad v. White, 243 U. S. 188; C. & E. Railroad v. Steele, 108 N. E. 4; McKee v. Elec. Ry. Co., 88 S. E. 616; Pedersen v. Del., Lack & W. Railroad, 229 U. S. 146. (2) At the time of the injury the relation of employer and employee did not exist. (a) Plaintiff was not at the time engaged in the business for which he was employed, but was on an enterprise of his own. Under his contract of employment he was to board and lodge himself, and was free to secure same where he pleased. He was employed to assist in erecting a semaphore at Savannah. (b) Hughes was not acting within even the apparent scope of his employment. He, too, went away from his place of employment on a private enterprise in no way connected with the work for which he was employed. No directions given by Hughes under such circumstances can be imputed to the defendant. Russell v. Ry., 83 C. C. A. 618; Ellsworth v. Metheney, 104 Fed. 119; Ill. Cent. Railroad v. Archer, 74 So. 135; Excelsior Products Mfg. Co. v. Railroad, 263 Mo. 142; O'Brien v. Western Steel Co., 100 Mo. 182. (3) The petition bases a right of recovery on the allegation that appellant had furnished a pass to Hughes, which permitted Hughes and the respondent to ride on any train designated by the said Hughes. Instruction 2 submitted to the jury the question as to whether or not, under all the evidence, Hughes had either actual or apparent authority to direct respondent to board the train in question. This instruction was a departure from the petition, and it was error to give it. Black v. Met. St. Ry. Co., 217 Mo. 672; Beave v. St. Louis Transit Co., 212 Mo. 331; Ely v. Ry. Co., 77 Mo. 34. Plaintiff is bound by the specifications of negligence in his petition. Strode v. Columbia Box Co., 250 Mo. 695. The instruction enlarged upon the proper scope of the petition, and authorized a verdict for plaintiff on an act of negligence not pleaded. Georgia v. St. Ry. Co., 164 Mo. App. 121; Silverthorn v. Lumber Co., 190 Mo. App. 716; Hufft v. Railroad, 222 Mo. 286. Said instruction constituted a departure for the further reason that it was

specifically alleged in the petition that the pass that Hughes carried authorized him to designate trains for plaintiff to board; whereas, the instruction, without regard to the terms of the pass, authorized a finding for plaintiff, provided Hughes had been accustomed to board freight trains while carrying a pass. It was not alleged in the petition that Hughes had been accustomed to ride freight trains by authority of the pass. (4) For the same reasons, and upon the same grounds, plaintiff's instruction 1 was erroneous in submitting to the jury the question as to whether Hughes had authority to direct the movements of the plaintiff in and about his work "and going to and from such work." The petition did not allege that defendant had conferred authority on Hughes to direct the movements of plaintiff in going to and from his work.

*Claude Wilkerson, Paul Barnett* and *F. P. Sizer* for respondent.

(1) It is contended by appellant that, as the semaphore that plaintiff was engaged in erecting was not being used and could not be used until completed, therefore plaintiff was not engaged in interstate commerce. As this semaphore was only a link in a chain of semaphores that had been in use and was to take the place of the old one just as soon as it could be installed, plaintiff was necessarily directly engaged in the interstate commerce in which the defendant was engaged, and therefore the case is governed by the Federal Employer's Liability Act. Grow v. Ore. Railroad, 138 Pac. 398, 150 Pac. 970; Coal Co. v. Deal, 145 C. C. A. 490, 231 Fed. 604, 245 U. S. 681; Central Railroad Co. v. Colasurdo, 192 Fed. 901; Saunders v. Southern Railroad, 167 N. C. 375; Law v. I. C. Railroad Co., 208 Fed. 869; Lamphere v. Ore. Nav. Co., 196 Fed. 336; Atlantic Coast Line v. Tomlinson, 94 S. E. 909; Dowell v. Wabash Railroad, 190 S. W. 939; Glunt v. Penn. Railroad, 95 Atl. 109; Davis v. Railroad, 134 Minn. 49; Salabrin v. Ann Arbor Railroad, 194 Mich.

458; Pederson v. Del. Lack. & W. Railroad, 229 U. S. 146. (2) The relation of employer and employee did exist. Plaintiff was not off on a private affair of his own. The evidence is undisputed that plaintiff was paid for the one hour which he spent while waiting at the depot to go to his work at Savannah. Whatever Hughes and plaintiff did in hunting and looking for room and eating accommodations at McAlester, plaintiff's evidence is undisputed that he did go to work and reported for work at the depot at seven o'clock, and it was during this hour that he was hurt, after he had reported for duty. 26 Cyc. 1086-87; Dumphy v. Norfolk & Western Railroad, 95 S. E. 863; Railroad v. Zachary, 58 L. Ed. (U. S.) 596; Thomas v. Railroad, 122 N. W. 456; Hartman v. Toyo Kisen Co., 244 Fed. 567; Rideout v. Pillsbury, 173 Cal. 132; Brownell Imp. Co. v. Sweeney, 223 Fed. 510; Beck v. Railroad, 59 S. E. 1015. The relation exists when the servant goes upon the master's premises a reasonable time before working hours, and remains until he leaves the premises a reasonable time after working hours, and exists while the servant is resting or in necessary inactivity. Chambers v. Mfg. Co., 14 L. R. A. (N. S.) 383; Light Co. v. Sawyer, 47 So. 67; Railroad Co. v. Brock, 49 So. 453; Lumber Co. v. Smith, 95 S. W. 800; Niece v. Creamery Co. 133 N. W. 878; Jacobson v. Mill Co., 119 N. W. 510; Chicago Rock Island & Pac. v. Smith, 172 S. W. 829. In determining whether or not the relation of master and servant exists, the manner of payment is a circumstance to be considered. Corbin v. Am. Mills, 27 Conn. 274; Tenn. Coal Railroad v. Hayes. 97 Ala. 201; Railroad v. Timmins. 100 S. W. 337. (3) Hughes, as well as Williams, had reported for work at seven o'clock, and his duties as employee or foreman had commenced when he gave Williams the negligent order; and, even though it might be held that Hughes and plaintiff were on a private enterprise in looking for a boarding place and lodging, yet, they had returned to the depot and were on duty at seven o'clock, before the order was given. The authority to give the order to board the

train was vested in Hughes, by putting the transportation for both men in his exclusive possession. Stool v. So. Pac. Railroad, 172 Pac. 101; 26 Cyc. 1163; Covington v. Sewell, 76 So. 318. Plaintiff's Instruction 2 was a departure from the petition. While the petition does state that Hughes was furnished a pass which "permitted" Hughes and Williams to ride on "any train designated by the said Hughes," yet the evidence fully justified the allegation, because he was permitted to ride on each train to which he presented the pass. (4) Plaintiff introduced evidence showing that Hughes had the authority to act. Defendant's evidence tended to prove a secret restriction upon Hughes' authority, so far as boarding certain freight trains was concerned, which secret authority was not known either to Hughes or to plaintiff. In other words, defendant offered to disprove the authority that Hughes had to select certain trains to ride upon, by introducing evidence to support the defense of *ultra vires,* In this class of cases the plea of *ultra vires is* a special defense and not available under the general denial. 10 Cyc. 1156; Hicks v. Nat. Surety Co., 169 Mo. App. 492; Williams v. Verity, 98 Mo. App. 660; Lumber Co. v. Beekman Lumber Co., 153 Mo. App. 386. Berberet v. Myers, 240 Mo. 58. (5) Instruction 2 was not broader than the petition, but was narrower than the petition. The petition alleged authority, and the instruction required the jury to believe there was at least apparent authority. It is not a variance to allege a negligent order given by one in authority, and prove a negligent order given with apparent authority. Oriental v. Barclay, 41 S. W. 117. Even if there was a variance, it was immaterial. Cameron v. Roth, 108 Mo. App. 265; Carson v. Quinn, 127 Mo. App. 525; Gardner v. St. L. Ry. Co., 167 Mo. App. 610.

GOODE, J.—This plaintiff, in an attempt to get on a freight train of the defendant company, fell under the wheels, and his left arm and left leg were so badly mangled it was necessary to amputate them. The accident oc-

cured Feb. 19, 1917, at the station of McAlester in the State of Oklahoma. Only six days before, plaintiff had taken employment from the company as a common laborer in the bridge construction and repair department; but he had been in the service of the company previously for three or four months in the same department. The local headquarters of the department were at Muskogee, Oklahoma, a town and station on defendant's railway fifty miles north of McAlester, and where the foreman of the bridge department hired plaintiff. Eight or ten miles south of McAlester is the station of Savánnah, and to this station plaintiff, on February 18, 1917, was ordered by the general foreman of the department to go, with a carpenter by the name of Hughes, to help Hughes in the construction of a semaphore; a device used by the railway company to signal trains. The general foreman said to plaintiff in Hughes' presence, "You will go with Mr. Hughes to Savannah to work on the semaphore signal." The company furnished Hughes a pass for the transportation of himself and plaintiff to Savannah. The pass was for "one carpenter and one employee, when presented with form 214,—between stations on McAlester Dist." Said form notified "passenger conductors and train auditors that the form identified Hughes and one man" as entitled to use the pass from Muskogee to Savannah. The printed rules of the company regarding the use of passes were put in evidence, and one of them provided that no pass would be honored on a freight train not scheduled to carry passengers, unless it bore on its back this endorsement: "Good on freight trains." Further, that passes must not be used for travel on personal business. Defendant was building a new depot at Savannah and a new semaphore to take the place of old ones still in use. The old semaphore was used for signalling both intrastate and interstate trains of the defendant company, as the railway lines of the company extend through several states and it operates trains through them. At the time of the accident the new semaphore had not been put into use for any purpose.; but when completed it would be one

of a succession of semaphores along the interstate lines
of the defendant company, just as the old one was and
had been. Plaintiff and the carpenter Hughes, who is
spoken of by plaintiff as a "straw boss," worked on the
semaphore during the day of the eighteenth, and not
having finished it at the hour for quitting work, intended
to continue their task the next day. Hughes said to plain-
tiff there "wasn't any place to stay in Savannah;" so
they would run up to McAlester for the night and return
to Savannah in the morning. Accordingly they took pas-
sage on a freight train and were carried to McAlester,
the conductor treating the pass, when presented by Hugh-
es, as authority to carry them. Plaintiff said he person-
ally knew nothing of whether or not there was a hotel
or other place to stop in Savannah and didn't look for
one. They spent the night at a hotel or boarding house
selected by Hughes, ate breakfast at a restaurant he
selected and went to the depot to take a train back to
Savannah. A freight train had been made up at North
McAlester, two miles away, and it came along past the
depot at McAlester at eight o'clock, but did not stop.
Hughes spoke to the engineer or some one in the engine
as it passed, and then told plaintiff they (Hughes and
plaintiff) would get on that train. Hughes caught the
train near the front end; then said to plaintiff; "Come
on; it is safe." Plaintiff attempted to get on; but when
he caught, or caught at, a grab-iron on the side of a car,
the rocking of the train, which was running from five to
ten miles an hour, according to diverse testimony, threw
plaintiff off his balance, caused him to lose his hold
of the grab-iron, and he fell under the train and received
the injuries we have stated. Plaintiff testified the
train seemed to be going pretty slow, and he thought he
could catch it; that he asked Hughes if it was safe before
trying to get on, because he (plaintiff) did not know
at what speed the train was running, or whether it
would be safe to attempt to catch it. He and Hughes
had been waiting at the station since seven o'clock,
and the defendant company afterward paid plaintiff

for that hour, which was the one when his day's work began. There was testimony that passes and orders like those Hughes was given for himself and plaintiff, were honored on freight trains as well as on passenger trains. Hughes so testified—said he had used such free passes for from three to five years on all kinds of trains; had never been given a book containing rules about the use of passes; had used them "on everything that came along" going to and coming from work, and was never instructed not to ride freight trains with such a pass. It should be stated that in an accident which occurred during plaintiff's first employment by defendant, his right arm was broken at the elbow and he was left crippled in that arm, so his use of it was not "very good." In his effort to clutch the grab-iron, he caught hold with his right hand, but failed to catch with his left; failed also to place his foot in the stirrup, and his hold by his right hand was jerked loose.

For convenience we have spoken of the Missouri, Kansas & Texas Railway Company as the defendant company; but the actual defendant is Charles E. Schaff, who was receiver of the company and operating its lines.

The petition was in two paragraphs, of which the first was drawn on the supposition that the plaintiff was hurt while he was assisting defendant as a carrier engaged in interstate commerce, and hence the case was controlled by the Federal Employers' Liability Act. The second paragraph stated a cause of action based on the theory that plaintiff's work when he met with the injury, was in connection with defendant's intrastate business. The court instructed there could be no recovery on the second cause of action.

The only finding of negligence upon which the jury were authorized to return a verdict for plaintiff was that Hughes gave him a negligent order to get on the moving freight train. In addition to finding that averment had been proved, the jury were required to find the following facts: plaintiff at the time of the

injury was engaged in defendant's service, under the direction and control of Hughes; that Hughes was foreman over him at the time and had authority to direct the movements of plaintiff in going about his work and to and from it; Hughes was furnished with a pass for himself and one employee; plaintiff and defendant were, at the time, engaged in interstate commerce; in obedience to the order of Hughes, and in the scope of plaintiff's employment, he undertook to get on the train and was jerked loose from the grab-iron, caused to fall under the train and injured; that the order of Hughes, if given, constituted negligence; plaintiff's injuries were the direct result of such negligent order, and that plaintiff did not assume the risk of the hazard to which he was exposed.

Whether he assumed the hazard depended, the court instructed, on whether it was one ordinarily incident to the business and known and appreciated by plaintiff; but if plaintiff was not aware of the danger, and did not appreciate the risk of getting on moving freight trains, he did not assume the risk.

The court also instructed that if the jury found plaintiff was not engaged in defendant's business when hurt but for his own convenience had made the trip to McAlester, and when hurt was seeking transportation back to his place of employment, plaintiff assumed the risk of boarding the train, and the verdict must be for defendant.

A verdict was given for plaintiff, and his damages assessed at twenty-five thousand dollars. After judgment had been entered on the verdict, defendant took this appeal.

I. The assigment of error for first attention is that plaintiff made no case for the jury, because the only act of negligence the jury was required to find, namely, the order of Hughes for plaintiff to get on a

moving train, occurred when neither plaintiff nor Hughes was engaged in the business of defendant.

**Injury on Way to Work.** If this assignment is good, plaintiff cannot recover on either the Federal statute or at common law. According to the testimony of plaintiff himself, he was free to go where he pleased after the day's work was over and to select for himself a place to eat and sleep. Naturally he would defer, somewhat, to Hughes, his foreman, in choosing lodgings; but in doing so would not be acting under Hughes' authority as foreman, but simply under his influence. Defendant had neither agreed to pay plaintiff's personal expenses while in its service, nor had reserved any control over him in respect of his board and lodging. The custom is so general for employees of a railroad company when sent out for duty on the line, to live where they work, in some boarding house or hotel, or in "bunk cars" of the company, that we may presume it was incumbent on plaintiff and Hughes to stay over night in Savannah, if they could find a suitable place; that is, one of the kind commonly used by persons in similar employment. Therefore, unless it was reasonably necessary for them to go to McAlester to spend the night, they were not engaged in the work of the company while they were away; and the company is no more responsible for the accident to plaintiff than it would have been if they had gone to a dance at McAlester and the accident had happened during their return trip. The argument for plaintiff at this point leaves out of view the necessity of the trip, and takes for granted plaintiff and Hughes, whatever was their reason for going to McAlester, were acting in the scope of their employment when they started back after seven o'clock, the hour when they were supposed to commence work for the day. But this was not so if they left Savannah on an errand of their own. The duty of plaintiff to obey the orders of Hughes as foreman, was primarily to do so when at Savannah and at work on the semaphore; and Hughes would have authority over his movements at McAlester after seven o'clock in the morning, only in

the event plaintiff had been forced to go there in conse-
quence of inability to procure accomodation for the
night at Savannah. The only evidence on this question was
the testimony of plaintiff himself that Hughes said there
was no place to sleep in Savannah. This testimony having
been received without objection, conduced to prove the
necessity to hunt quarters elsewhere; and for aught that
appears, McAlester was as accessible as any place. Such
being the condition of affairs, the pertinent inquiry is not
as to whether plaintiff and Hughes were within their
employment while traveling to McAlester and while pass-
ing the night there; but whether they were engaged in
defendant's service on the way back to their task and
after the hour for them to resume work had arrived.

The question of the necessity of the trip was not
as pointedly instructed upon as it could have been; but
an instruction given by the court of its own motion, fair-
ly presented it, in the absence of requests by the parties
for more definite charges. The requests of plaintiff
required the jury to find the command of Hughes was
given "in the due performance of his duties;" but did not
require them to find the existence of the only condition
under which the command would have been given in the
performance of Hughes' duty, namely, that the parties
had gone to McAlester because they could find no place
to stay over night in Savannah.

A refused request of defendant excluded a verdict
for plaintiff if the jury found he "was required to pro-
vide and pay for his own board and lodging; had the
right to select the place where he would board and
lodge," and in the exercise of that right, went with
Hughes to McAlester. Said instruction took no account
of the possible necessity to go there; and as far as it
had any merit, was covered by the one we have summa-
rized, given by the court of its own motion and denying
recovery if the trip was taken by plaintiff for his own
convenience and not as incident to his employment.

In view of the evidence to prove there was no place
in Savannah where Hughes and plaintiff could spend

the night, we hold it was not shown beyond an inference to the contrary the parties were acting outside the scope of their duty to defendant when the accident happened.

The liability of an employer for injury to a workman in his service, where the workman is absent from the place of his task, depends, in instances like the present, on whether the absence was voluntary on the part of the workman and for some purpose of his. own, or for some reason, was involuntary and compelled; and one of the reasons may be the conditions at the spot where his task lay.

Two contrasted cases present this proposition clearly. In one a miner had been killed by an exposed and charged electric wire running along a passage in the mine, while the deceased was returning at noon from a social call on a fellow-workman. The defendant was held not to be liable for the accident on the theory that the deceased was a servant engaged in the master's work when killed; the court, citing in support of the proposition, 1 Shear. & Red., Negligence, sec. 190; Wright v. Rawson, 52 Iowa, 329; Kennedy v. Chase, 119 Cal. 637. In the aspect of the case that the defendant had maintained a defective appliance in a place where it was dangerous, because the workmen were accustomed to assemble there, the court held there had. been neglect which afforded ground for recovery. [Ellsworth v. Metheney, 104 Fed. 119.]

In the other case an employee was hurt by an explosion while he was eating lunch on a dry knoll some distance from where he had been at work. According to the habit of the workmen and as the employer knew, he had gone to the knoll to eat because the part of the grounds where he was working was marshy. He was allowed to recover. [Thomas v. Railroad, 108 Minn. 485.] In the emergency, such as according to the immediate hypothesis, the plaintiff and his boss found themselves, it was as good cause to leave Savannah for the night, as was the marshy ground for the injured

employee to go to the dry knoll to spend his dinner hour.

In another case very similar to this one, an electrical engineer had gone out on a line of the defendant railroad company to work, and in the course of his duty was due the next day at the station where the headquarters of the department were, to receive further orders. He desired to get in the previous evening so he might obtain a night's rest, and to accommodate him the train conductor at the station where he had been working, telegraphed the conductor of a freight train which would pass the station, to "slow down" there so plaintiff could get aboard and be carried to headquarters. The conductor did not cause the train to "slow down;" and in endeavoring to catch the side of a car as it passed, the plaintiff fell under it and an arm and leg were cut off. A contested point therein, as here, was whether the plaintiff was engaged in interstate business when hurt; the railroad company arguing that he was not, because, at the time, he was not engaged in any work at all for the company. In disposing of the proposition, the court declared it was the plaintiff's duty to get back to headquarters, and until his duties, begun in the morning, were concluded at night, he must be regarded as being engaged in interstate commerce; meaning, of course, that during the work day he was in the company's service, and as its trains were engaged in interstate transportation, the plaintiff was engaged in interstate commerce. The point of the plaintiff's freedom of action at the close of the day was pressed; but the court rejected it because, as he was under the duty to return to headquarters, he was still occupied for the company when he attempted to return by the freight train. [Dumphy v. Railroad, 82 W. Va. 123.]

That an employee, on his way to and from his work, and using in his movements the premises or an instrumentality of the master, which he is authorized to use, is at the time in the master's service and may recover,

if hurt by any negligible defect in the property, on the ground of a breach of the master's duty to furnish a safe place or appliance, is a doctrine accepted by many courts. But if, when hurt, he is going away from his task on his own business, or returning to it after leaving it on his own business, and not from some kind of compulsion, the same courts rule the other way. There is discord, real or apparent, in the decisions, and the cases *pro* and *con* are collected in notes to King v. Mondota Coal Co., L. R. A. 1916 F., 1220; and to Taylor v. Bush & Sons Co., 12 L. R. A. [N. S.] 853; and see Hartman v. Steamship Co., 244 Fed. 567.

The court of last resort, in cases of injuries to employees of carriers engaged in interstate commerce, has declared on the subject as follows:

"In leaving the carrier's yard at the close of his day's work, the deceased was but discharging a duty of his employment. See North Carolina R. R. Co. v. Zachary, 232 U. S. 248, 260: Like his trip through the yard to his engine in the morning, it was a necessary incident of his day's work and partook of the character of that work as a whole; for it was no more an incident of one part than of another. His day's work was in both interstate and instratate commerce, and so when he was leaving the yard at the time of the injury his employment was in both." [Erie R. R. Co. v. Winfield, 244 U. S. 170, 173.]

The same principle of liability will govern if the employee was forced away from the locality of his task and to get back there was directed by his superior to use an instrumentality of the employer, when the order to do so was negligent by reason of the instrumentality being dangerous to use, either from a defect or its operation. If Hughes and plaintiff were in service, as determined by the test we have pointed out, when the former directed plaintiff to board the moving train, then the case is like one heretofore decided by this court, where an employer was held answerable to an employee injured while he was obeying a negligent order of his

foreman to board a train. [Foster v. Railroad, 115 Mo. 165; see, too, York v. Railroad, 117 Mo. 405; Herdler v. Stove & Range Co., 136 Mo. 3.]

II. We have to determine next whether plaintiff was engaged, when hurt, in a task so closely connected with interstate commerce as to bring him within the provisions of the Federal Employers' Liability Act (Act Cong. approved April 22, 1908; 35 U. S. Stat. at. Large, p. 65, c. 149, as amended by act approved April 5, 1910). The statute makes a common carrier "liable in damages to any person suffering injury while he is employed by such carrier in such commerce;" that is, in commerce between any of the several states or territories, as provided in the first lines of the act. The meaning of the words "while he is engaged by such carrier in such commerce" controls the decision of the question whether State law or the Federal act determines, in a particular case, the liability of the carrier to an injured employee. A mass of adjudications have been made on the subject by State courts of last resort and Federal courts of intermediate resort; and some of them favor the view that plaintiff was injured while employed by defendant in interstate commerce. [Grow v. Oregon Short Line Ry. Co., 44 Utah, 160; Saunders v. Railroad, 167 N. C. 375.] In the cited cases employees were killed while assisting to install on the lines of the defendant companies, a system of automatic block signals, similar, we understand to the semaphore plaintiff was working on. The particular block or semaphore the deceased brakemen were helping to construct had not been completed or introduced into the general system of signalling devices. Nevertheless the courts thought the men were engaged in work connected with interstate commerce, because, in the first case, the portion of the system already completed was in use for signalling interstate trains, and the signalling block the deceased was engaged upon would be thus used when finished; and in the second

*Interstate Commerce.*

case, a new system of signals was in process of erection to take the place of an old system; exactly the fact here, except that this plaintiff was helping to build a single semaphore to be substituted for an old one. Without referring to other cases to the same effect, but less like this case in their facts, we state that, notwithstanding the cogency of the reasoning of the opinions, the force of all of them as precedents appears to be broken by the most recent decisions of the Supreme Court of the United States on the subject. [1 Roberts, Fed. Liabil. of Carriers, sec. 485, p. 840.] Where the carrier conducts both an intrastate and an interstate business, and its employees are occupied first with the one and then with the other, the relations of the particular work the employee is performing when hurt, to the interstate business of the carrier, is resorted to as one criterion of whether the Federal statute controls; and is the decisive criterion, we think, when the facts are like those before us. And in settling the tests of the application of the statute, the courts have been forced to make close distinctions. According to the latest judgments of the Supreme Court of the United States, it is not essential that the appliance the injured employee was working on at the time was or had been itself actually in use as a means of interstate commerce, if it was "so closely connected therewith as to be a part of it," to quote the language of the opinion in the Pedersen case (229 U. S. 147, 151). That plaintiff was injured through the negligence of a co-employee under these circumstances: A bridge over which interstate trains passed was in process of repair and the repairs consisted in taking out an old girder and inserting a new one. A person had to pass over an intervening temporary bridge to reach the old one, and the temporary bridge was in use, too, for interstate trains. While carrying a sack of bolts over the temporary bridge to the one undergoing repair, Pedersen was negligently run down by an interstate train. He was held to have been engaged in interstate commerce on this line of

reasoning: bridges are indispensable in such commerce and should be kept in repair, and the work of keeping them in repair "is so closely related to such commerce as to be in practice and legal contemplation a part of it." The court further said: "The contention to the contrary proceeds upon the assumption that interstate commerce by railroad can be separated into its several elements and the nature of each determined regardless of its relation to others or to the business as a whole. But this is an' erroneous assumption. The true test always is: is the work in question a part of the inter-state commerce in which the carrier is engaged? . . . Of course, we are not here concerned with the construction of tracks, bridges, engines or cars which have not as yet become instrumentalities in such commerce, *but only with the work of maintaining them in proper condition after they have become instrumentalities and during their use as such.*" (We emphasize.) The court thought the work of taking bolts to the old bridge to be used in repairing it, though a minor task, was essentially a part of the larger one. Those facts were held sufficient to sustain a finding that Pedersen was engaged in interstate commerce when injured. Three judges dissented, declaring the true rule was that only employees engaged in the work of interstate transportation were within the act, and not those who kept up the instrumentalities whereby transportation was conducted. The words we have emphasized suggest that, although an employee helping with repair work upon an appliance used in interstate traffic is within the statute, one engaged in constructing an appliance that will be, but has not yet been, so used, is outside the scope of the act. An employee who was negligently hurt while mining coal in a colliery of a carrier, the coal to be used in interstate commerce, was held not within the act. [Del. etc. Ry. v. Yurkonis, 238 U. S. 439.] In Ill. Cent. Railroad Co. v. Behrens, 233 U. S. 473-478, a member of a switch crew was killed while assisting to move cars loaded with intrastate freight in the City of New Or-

leans; but the crew also handled interstate freight. The court decided the deceased was not within the purview of the Federal act when killed, though upon the completion of his immediate task, he was expected to engage in another which would have been a part of interstate transportation under the statute; "for by its terms," said the court, "the true test is the nature of the work being done at the time of the injury." In Shanks v. Railroad Co., 239 U. S. 556, the rulings of the United States Supreme Court up to the date of the decision were reviewed, and in the light of them the plaintiff Shanks was held not to have been employed in interstate traffic, while putting in a shaft to transmit power to machinery by which locomotives that drew both interstate and intrastate trains were repaired. The court said, at page 559:

"Coming to apply the test to the case in hand, it is plain that Shanks was not employed in interstate transportation, or in repairing or keeping in usable condition a roadbed, bridge, engine, car or other instrument then in use in such transportation. What he was doing was altering the location of a fixture in a machine shop. The connection between the fixture and interstate transportation was remote at best, for the only function of the fixture was to communicate power to machinery used in repairing parts of engines some of which were used in such transportation."

The like ruling was made where an employee lost his life in switching coal from a storage track to a coal shed, thence to be taken to bins and chutes and used, as occasion required, on locomotives engaged in both kinds of commerce. The court said there was no close or direct relation to interstate transportation in taking the coal to the chutes; that the employee was doing no more than putting the supply in a convenient place for use when it was required. [C., B. & Q. Ry. Co. v. Harrington, 241 U. S. 177.] A plaintiff had been injured while working in a tunnel which was in the process of construction by a carrier and to be part of its line for all its trains. At

the time of the accident it was incomplete and had never been used in interstate commerce. The opinion said it was certain under the recent decision of the court, whatever doubt might have existed at the time the judgment below was rendered, that the plaintiff was not engaged in interstate commerce at the time he was hurt; consequently no cause of action was alleged under the Federal act. [Raymond v. Railroad, 243 U. S. 43.] An employee hurt while employed on the construction of a bridge which had never been provided with rails nor used as a railroad, was not doing interstate work when hurt in the course of his employment, although the employer intended the bridge to be a means of interstate traffic when it was completed. [Bravis v. Railroad, 217 Fed. 234, 133 C. C. A. 288.] The opinion said the bridge had not been used in interstate transportation and could not be used until finished; the fact that the intention was to use it at some future time did not make it a means of interstate commerce; the intention might be changed and the bridge not be used in that way at all. Answering the argument that the cutout, of which the bridge would constitute a part, was the correction of a defect in the defendant's road for interstate trains, the court said the argument was too remote and inconsequential; that the building of the cutoff was a new construction work as much as would be the building of a new engine or car to take the place of an engine or car worn out in interstate commerce.

The national courts in construing the act in question, and in order to determine the status of an employee injured when employed upon an instrumentality which, as yet, has not been put into use in interstate business, but is intended to be, have drawn a distinction between construction work and repair work, and hold a workman engaged in repairs on an appliance employed in interstate traffic is within the provisions of the act; whereas one helping to make a new appliance to be thus used in the future is not so engaged. This is the rule formulated in an exhaustive annotation on the question, wherein many cases are cited in its support. [Seaboard A. L. Railroad

Co. v. Horton, L. R. A. 1915 C. note f. p. 63.] It is true, as said in a well reasoned case, the distinction between repairs and construction work must not be too finely drawn; the particular matter the court then had under advisement being whether an employee killed in putting in new cross-arms on old poles to carry electric wires used in telegraphing and signalling, was engaged in interstate commerce. The court held the work was in the nature of repairs and, therefore, the case fell within the Federal act. [Ross v. Sheldon, 176 Iowa, 618.]

Neither the semaphore plaintiff was assisting to build, nor the new depot was yet in use in any kind of commerce; for the old semaphore and depot had not been discarded. In fact the new ones were incomplete and the semaphore appears to have been far from completion. As suggested by Judge SANBORN, in the Bravis case, neither had ever been used and it is possible neither ever would be used; for some mishap might destroy them.

The substantive rules of tort liability, as fixed by the adjudications in this State, differ materially from those which obtain in cases falling under the Federal statute; particuarly in regard to the doctrines of contributory negligence and assumption of the risk. Under the law of the State, contributory negligence on the part of an injured party is usually a defense; whereas under the Federal statute it goes only to reduce damages; and assumption of the risk is given a wider scope by the national courts than is allowed in Missouri. The Supreme Court of the United States has held that in a case within the act of Congress, the Federal law "is exclusive and supersedes State laws upon the subject." [Chicago Ry. Co. v. Wright, 239 U. S. 548, 551.] For these reasons it is plain that if a cause of action was not within the scope of the act, but was tried as though it were, it must be retried, unless the rules of law, affecting liability and as established by the courts of the State are the same as those which obtain under the Federal statute or are less favorable to the party against whom the verdict was given.

Plaintiff's counsel insists defendant should not be heard to say no recovery can be had under the Federal act, because the court, at defendant's request, instructed against a verdict on the second count, which de-clared on a common-law liability. Maybe there would be force to this contention if defendant had insisted be-low the question of its liability was governed by the Federal law; but the position taken by defendant was that there was no case under either law; and so it requested a charge that plaintiff was not entitled to recover on the first count, and another charge that he was not entitled to recover under the second count. The court refused the first request and gave the second—erroneously, we think.

III. Too much attention was given by both sides to the free pass Hughes had for himself and plaintiff. The defendant contends plaintiff was a trespasser in attempting to board a freight train, because the pass gave no right to ride on freight trains, and under the rules of the company it could not be used in that way. Neither plaintiff nor Hughes knew anything about the rules, and plaintiff did not know anything about the terms of the pass, and if Hughes' testimony is true, he did not; for he said similar passes always had been honored by the conductors of freight trains. In fact, this very one was honored on the trip from Savannah to McAlester. There is no merit in the contention that plaintiff was attempting to trespass.

**Free Pass.**

The free pass was admissible as an item of evidence to prove plaintiff was under Hughes' authority, inas-much as it read in favor of Hughes and "1 man," and had been turned over to him. Being in Hughes' custody all the time, so that if separated from him plaintiff would have been deprived of its benefit, and maybe with-out means of any kind to take him to Savannah, it bore upon the issue of plaintiff's contributory negligence and assumption of the risk. It was treated in the second instruction given for plaintiff in a manner to magnify, in the eyes of the jury, its importance, and confuse them

regarding the issues to which it was relevant. Wherefore the instruction was a comment on one part of the evidence and adapted to give the impression that the possession of Hughes made his order to plaintiff a negligent one. As we have said, the pass and his custody of it had a bearing on his authority to give the order, and on whether or not plaintiff was justified in obeying it; but did not have a bearing on the issue of the character of the order. That matter depended on the speed of the train, the experience of plaintiff, his physical condition, and the like facts. The jury's attention should not have been fixed on the pass to the degree it was in an instruction submitting the issues of whether the order of Hughes was negligently given and whether he ought to have known it was. [Smith v. Woodmen of the World, 179 Mo. 119.] Though this error by itself may not have been prejudicial to the extent of causing a reversal, it should be avoided on another trial.

If we are right in our judgment that the case does not come within the Federal act, the issues of contributory negligence and assumption of the risk will be governed by the rules of law touching those subjects that prevail in this State.

The judgment is reversed and the cause remanded. *Blair, P. J.,* and *Woodson, J.,* concur; *Graves, J.,* dissents in separate opinion.

GRAVES, J. (dissenting).—I dissent in this case, because the plaintiff's evidence (in my judgment) fails to make a case either at common law, or under the Federal Act. I agree with my learned brother in his reasoning as to there being no showing of liability under the Federal Act. But I am of opinion that neither Hughes nor plaintiff was about the master's business at the time of the accident. The evidence as to their reason for the trip to McAlester is entirely too shadowy to form the basis of liability. The necessity of such a trip is not sufficiently shown. It is highly improbable that these two men could not have found food and lodging at or

near their place of work. At least it is clear that plaintiff made no effort so to do, and was in no position to show necessity for his trip.

Other suggestions might be made, but these will suffice. I therefore dissent.