# CARRIE CRAVEN, Plaintiff in Error, v. THE MIDLAND MILLING COMPANY, Defendant in Error.

### In The Kansas City Court of Appeals, January 30, 1922.

1. **NEGLIGENCE: Master and Servant: Negligence as to Employee Falling while Obeying Order to Stand upon Ladder and Door While Cleaning Machinery, Held Question for Jury.** In an action for injuries received by employee of milling establishment who slipped and fell while complying with an order to stand upon a ladder and door of a roll machine while cleaning machinery, overhead with an ordinary broom, *held*, a question for jury as to negligence either in failing to furnish plaintiff a reasonably safe place in which to work. and reasonably safe instrumentalities with which to work in performing work she was directed to do, or in ordering plaintiff to stand upon door, but that she voluntarily chose to do so herself,

2. ———: ———: **Assumption of Risk and Contributory Negligence of Injured Employee Held Question for Jury.** Plaintiff was not chargeable with assumption of risk or contributory negligence, as a matter of law, for to so hold would be to say conclusively the master was not negligent, and that plaintiff was not ordered to stand upon door, but that she voluntarily choose to do so herself.

3. **APPEAL AND ERROR: Appellate Court May Consider Merits of Question Whether Plaintiff is Entitled to go to Jury Where Only Missing Evidence is Photographs, Which Did not Conclusively Show Plaintiff Had no Case.** In an action by mill employee for personal injuries the general rule that the appellate court cannot pass upon merits of the question whether plaintiff is entitled to go to jury when the record does not contain entire evidence offered does not apply where the missing evidence consists of two photographs, one of the machine, the door of which plaintiff stood upon, and the other of a row of machines, and also a short ladder, all three of which were introduced in evidence as exhibits, where none of them could show conclusively that plaintiff had no case.

4. ———: **Photographs Introduced as Exhibits Should not be Omitted from Record Because Stenographer Deemed it Impracticable to Include Them.** Whether photographs were mounted on cardboard or flexible cloth. it would be a dangerous precedent to allow exhibits to be omitted from bill of exceptions because the stenographer deemed it impracticable to include them.

5. ————: **Where There. is no Formal Call for Exhibits in Bill of Exceptions, a Motion too Compel Their Production Cannot be Sustained.** Where there is no formal call for exhibits in the Bill of Exceptions, the motion of plaintiff to compel defendant to produce them cannot be sustained, and the motion to require the production of said exhibits, as originals, in appellate court, is overruled.

6. ————: **Plaintiff Will not be Turned Out of Court for Failure to Incorporate in Record Certain Evidence Which Could not Conclusively Prevent a Recovery.** Where it is manifest there could be nothing appearing in exhibits omitted from record which could settle the foreclosure of plaintiff's right to go to jury, the plaintiff will not be turned out of court on the theory that she failed to bring all of the evidence before the appellate court.

7. ————: **Nonsuit Held Involuntary from Which an Appeal Will lie.** Where the record shows that at the conclusion of all the evidence the defendant offered a peremptory instruction in the nature of a demurrer to the evidence which the court marked "Given," and before final submission of case and the reading of said instruction to jury, plaintiff, by leave of court, suffered an involuntary nonsuit with leave to move to set the same aside, *held*, that upon the record an involuntary nonsuit was taken from which an appeal will lie.

8. ————: **Bill of Exceptions: Record Proper Derives no Force or Validity by Any Recital in Bill of Exceptions.** The record proper derives no force or validity by any recital in the Bill of Exceptions.

Appeal from the Circuit Court of Jackson County.—
*Hon. C. A. Burney,* Judge.

REVERSED AND REMANDED.

*Elon Levis* and *Atwood, Wickersham, Hill & Pop-ham* for plaintiff in error.

*J. C. Rosenberger, Rollin E. Talbert* and *T. A. Costolow* for defendant in error.

TRIMBLE, P. J.—The controversy herein was before this court on appeal, at the October Term, 1920. See Craven v. Midland Milling Co., 228 S. W. 513, where the appeal was dismissed for plaintiff's failure to bring

up all of the testimony when the only contention was that the court had erred in sustaining a demurrer to the evidence. It is now brought up on a writ of error.

Defendant runs a large milling establishment, eight stories high, the fourth floor of which is a large open room having therein a row of "roll machines" from which long pipes run up, together with such apparatus. as is necessary to convey the flour and milling material in the business. These "roll machines" are about six feet high, enclosed and box-shaped at the base, somewhat rolling at the top, and, at the front side about three feet from the floor, is a small metal door, about five inches wide and thirteen inches long. This door when closed is practically vertical, but when opened, or let down, it is horizontal. The machine does not rise perpendicularly from the top of the door when closed, but, at a point a few inches above the door, the front "bulges out" three or four inches and then slants back as it goes on up to the top of the machine.

Plaintiff, a woman 42 years of age, was employed on the third and fourth floors as a sweeper and as an oiler and cleaner of machinery.

On the morning of November 28, 1918, plaintiff went to work as usual about 7:30 o'clock on the fourth floor as oiler and sweeper. She was dusting in the room, having an ordinary handled broom and a brush with a handle on it "like a lady would dust a room with."

About 9 o'clock something about the mill broke necessitating the shutting down of the mill, and the machinery ceased running. Thereupon, plaintiff's foreman told her to stop dusting, get a ladder and clean overhead pipes, fill oil cups and work above.

Plaintiff testified that she went down to the third floor, inquired there for a ladder but was unable to find one, and upon returning to the fourth floor, the foreman told her he thought she was at work and inquired why she wasn't doing what he had directed; that she thereupon informed him she could not find a ladder. Ac-

cording to her evidence, the foreman then ordered plaintiff to let down the door on the "roll machine" and stand upon that, and assured plaintiff it was safe for her to do so, and she promptly obeyed the order. Plaintiff say she "had all the confidence in what the foreman said;" that the foreman "seemed to be in a hurry, and was rather impatient and anxious." Plaintiff says she "put her knee on the door" and got up there. After getting her feet on the now horizontal door, she pulled her "ordinary handled broom" which was all she had, up to where she was, and, reaching up with it, made a stroke with the broom. As she did this, her feet slipped on the smooth, iron, inner or upper side of the door and she fell on the concrete floor striking her ear against a hot radiator. She was severely burned, her wrist was broken, she was injured internally and in her back, her hearing was affected and her wrist was weakened and deformed. She says neither a ladder nor a long handled broom were provided, but that afterwards when plaintiff returned to work she was furnished with a "nice long brush" and "a dandy good stepladder." Neither of these, according to her evidence, were furnished before she was hurt.

There was flour on the inner or upper side of the door, and after her fall the mark therein across the door showed where her foot had slipped. The door did not bend or sag in any way, nor was it broken. Plaintiff had on cloth-topped button shoes with ordinary low heels and was wearing overalls. The inner side of the door whereon plaintiff stood was "slick," but plaintiff had not examined it nor paid any attention to it before she fell. However, she admitted that she had opened these doors a number of times before, that when she was waiting to help the millers with their work it was a part of her duties to open these doors and that she knew what the inside surface of them was like. As this was a flouring mill and she was employed to sweep and dust, no doubt "dust and flour" got upon everything and the

foreman so testified. Doubtless, however, it would not accumulate on things out in the room like it would on the inside of the machines since the rooms were swept and dusted. Defendant's evidence shows it was necessary to dust and clean the room, and that in the work of the machine the flour passed over the surface of the door.

There was a ladder in this room on the fourth floor, about four feet high, with a top about 18 inches long and 12 inches wide, not a stepladder, but it sat solid and square on the floor and was a ''very substantial looking'' ladder, according to the description given of it by defendant's witnesses.

But plaintiff testified that this ladder was never used to stand upon but was kept at the miller's desk where the books were, and was used there to sit upon; she had never seen it used for any purpose. Consequently, when the foreman told her to get a ladder she never thought of that one, although no one was sitting on it at the time, there being no one in the room at the time. She went to the third floor in search of one. One of defendant's witnesses, Mrs. Stroud, says this ladder was kept at the miller's desk, where the miller sat and made out their records, and that was where she always saw it Another witness of defendant, Morris, who had worked at the mill two and a half years, who knew plaintiff and was employed there at the time she was hurt but not on that shift at the time, said he recognized the ladder in evidence and that it was kept on the fourth floor. He was then asked—

''Q. For what is it used? A. Well, it is used for a ladder; that is what it was made for. Of course, we *sit on it there*—when we are not using it.

''Q. Is it used by anyone besides the millers? A. Well, they do not usually take it away from that floor.

''The Court: Q. State what they use that for on that floor. A. Well, to get up on, anything you would want to.

209 M. A.—36

"Q. Just name some of the purposes for which it is used. For what purposes do they get up on it? A. Well, you could use it to get up to brush off machinery and spouts, or anything.

"Q. And was it used for that purpose? A. Well, *I couldn't say about that.* That is what it was there for, though."

The foreman, also defendant's witness, said this ladder was "used for any purpose where we used a ladder; no special purpose;" that it was used to get up to a spout on top of a machine but he *didn't know that plaintiff ever used it.* Later he said that plaintiff in cleaning the spouts would "usually get *a* ladder and broom;" that it was "sometimes this ladder and sometimes another ladder," a step ladder, probably a little taller than the other one, and that it was "usually kept on the third *or* fourth floor." He admitted that "we used it to sit on" and that the men did sit on it. He admitted he "told her to get a ladder and brush down the spouts on the fourth floor" and later said that he told her to "get a ladder and don't climb on that machine;" that he "thought a ladder was safer," yet, in a moment after, he said the door was "absolutely safe to stand on" and he had "stood on it a million times." But he may have meant it was safe, for *him* for he said he never put anyone else on them and that he never used a ladder because it was "handier for me and safe for me." He denied ordering the plaintiff to get on the door.

Plaintiff testified that she never did get upon the door of the machine on the fourth floor but once before the occasion of her fall, and that was when she was ordered to do so by the head miller to clean off some oil on the pipes; that she did have to climb up on the machinery, radiators, window sills, elevator boxes, etc., on the third floor, but the machines there were smaller, had running boards on them and in climbing where she did on the third floor she could hold to things with one

hand while she swept or dusted, but that she never got upon the door of the machines on the fourth floor except the two times mentioned, both of which times she was ordered to do so. She was cross-examined as to her deposition previously given, but explained that what she said in it about climbing on the machines "many times" had reference to the third floor, and that when she said therein that she had gotten on the machines on the fourth floor "a few times," she had reference to the two times she was ordered to do so; that in dusting on the fourth floor, with the exception of the two times mentioned, she had only dusted as high as she could without getting on anything. In her deposition, in answer to the question "Had you done it before, got upon those doors?", she answered, "No, I have not, I have had to crawl on the *other* machines anyway I could to do the work." This may refer to the machines on the third floor as she says it did, when testifying on the trial, or it may mean the machines on the fourth floor. But her deposition continued wherein her cross-examination therein said: "We are talking about the roll stands on the fourth floor, the doors?" and she replied "Yes."

"Q. Haven't you been on all of those at times? A. I have.

"Q. Haven't you stood on all of them? A. Not every door, no, sir.

"Q. Haven't you stood up on a good many of them? A. I have a few times."

Again, in her deposition the following cross-examination occurred:

"Q. How did oil get on those pipes? A. I don't know where it came from; it was yellow stuff on the pipes and I was ordered to get up there, but this time the machines were down when I was hurt.

"Q. About how many times did you ever clean spouts down there on the fourth floor when the machines were running? A. Well, that is too numerous to mention.

"Q. You mean to say it was customary for you to clean those spouts and get upon those machines when they were running? A. I didn't say that.

"Q. As an ordinary thing? A. When the mill was down we had to get on those machines.

"Q. I am asking the question; was it an ordinary thing to get up on the machines when they were running? A. I say no; I only did that one time.

"Q. You say you did just that one time? A. When they were running, but when they were down we had this work to do any way we could."

At the trial she repeatedly said, however, that she did not get upon the door except the two times she was ordered to do so, and that while she didn't remember testifying as above, she supposed she gave it as it was written, but might have made a mistake as she meant she had stood on two of them, once on each door.

It seems to us that even conceding that her deposition is contrary to what she says now about standing on the doors, still is not her explanation thereof for the jury to pass upon and for the jury to say which shall be accepted? Can it be said that the trial court can, as a matter of law, decide that her explanation does not explain and that she is conclusively bound by her deposition, and that, therefore, she did not rely upon the foreman's order in getting upon the door? Of course, her mere *ipse dixit* now that she relied upon the order should perhaps not be accepted, *if* her evidence conclusively shows that she voluntarily got upon the doors at other times to do her work. But is it for the trial court to say this? We think not.

In view of all the circumstances and situation detailed above, we do not think it can be said that conclusively no case was made for the jury. The slick metal door, made still more slick, no doubt, by the dry flour passing over it, was not a reasonably safe place for her to stand, certainly not as safe as a ladder, and the foreman says it was not. His saying he told her not to get

on the door is also a concession that it was not safe, and he agrees with her in saying he told her to get a ladder, though he denied telling her to get on the door. A case was presented for the jury under at least one and perhaps more of the alleged grounds of negligence stated in the petition, namely, in either in failing to furnish plaintiff with a reasonably safe place to work (Reese v. Loose-Wiles, etc., Co., 224 S. W. 63; Edwards v. Morehouse, etc., Co., 221 S. W. 744; Kautz v. St. Louis Refrigerator Car Co., 219 S. W. 719; Doyle v. Missouri, etc., Trust Co., 141 Mo. 1); or, in failing to supply reasonably safe instrumentalities for plaintiff's use in performing the work she was directed to do (Walsh v. Union Quarry, etc., Co., 223 S. W. 1082, 1084; Haney v. St. Regis Mining, etc., Co., 205 S. W. 95; Sullivan v. Hines, 218 S. W. 406, 409; Morgan v. Sunflower Zinc Co., 109 Mo. App. 26); or, in ordering plaintiff to stand on the door (Bradford v. City of St. Joseph, 214 S. W. 281; State ex rel. v. Ellison, 223 S. W. 671; Gilbert v. Hilliard, 222 S. W. 1027; Sullivan v. Hines, supra); or, in assuring plaintiff the place was safe (Boten v. Sheffield Ice Co., 180 Mo. App. 96; Hayden v. Gravel, 186 S. W. 1193; Dyrz v. Hammond Packing Co., 194 S. W. 761; Williams v. Schoff, Receiver, 222 S. W. 412).

There cannot be, as a matter of law, either assumption of risk or contributory negligence on her part, for to so hold would be to say that conclusively the master was not negligent, and that plaintiff was not ordered to stand upon the door, but that she voluntarily chose to do so herself. [Reese v. Loose-Wiles Biscuit Co., supra; Perlin v. Water-Pierce Oil Co., 182 S. W. 1013; Williams v. Pryor, 200 S. W. 53, 55; Sullivan v. Hines, supra; Savage v. Roterman, etc., Const. Co., 214 S. W. 290, 292; Yates v. House Wrecking Co., 195 S. W. 549, 550; Willadsen v. Blue Valley, etc., Co., 214 S. W. 258, 262.] Of course, no claim can be made that to stand on the door was so obviously dangerous that no prudent person would have obeyed an order to stand thereon.

Defendant makes no serious reply to these matters except to say that her deposition shows that she had voluntarily stood upon the doors before and therefore she did not reply upon the foreman's order. But this has been already referred to.

The defendant contends that we cannot pass upon the merits of the question whether a plaintiff is entitled to go to the jury, when the record plaintiff has brought up does not contain the entire evidence offered in the case. There is no question but that such is the general rule, but, like all other general rules, it is not without its exceptions, and this, we think, is one of them. The missing evidence consists of the two photographs, one of the machine the door of which she stood on, or one just like it, and the other of the row of machines on the fourth floor, and also the short ladder, all three of which were introduced in evidence as exhibits. None of the three was incorporated in the Bill of Exceptions.

It will be observed that, on *this point,* the question is not whether there was sufficient evidence to go to the jury, nor whether there was any evidence to justify a verdict which has been rendered. The question here is, *can it be said* that the two photographs and the ladder, or anyone of them, *might possibly show* that *conclusively* plaintiff *had no case?* We are firmly convinced that they cannot. They might contain matters which a *jury* could accept as finally inclining them toward a particular verdict, but in such event *they* would be rightfully passing upon the disputed questions in the case. But the trial *judge* could not decide these disputed matters. There could be nothing in the photographs or in the ladder that could, as a matter of *law,* show that plaintiff had no case. The judge could not look at any one of these and say "This settles the matter beyond all controversy." Nor could we, if the exhibits were here before us.

Again, the machine, door and ladder were minutely described by the witnesses in the evidence, and there is no dispute about their size, height, or dimensions,

nor is it contended anywhere that they, or either of them, *conclusively* settle the case either way.

So far as the ladder is concerned, it is a ponderous article not capable of being physically incorporated in the Bill of Exceptions, but, being described and identified in the bill, could, if brought before us, be treated as a part of the record. [O'Neill v. Chicago, etc., R. Co., 62 Neb. 358.] In a case wherein the appellant court could itself pass on the evidence and decide it, the Supreme Court refused to sustain the objection that the record was incomplete because certain deeds offered in evidence were not incorporated in the record, it being manifest that they could not conclusively settle the case either way. [Fox v. Hubbard, 79 Mo. 390, 399. See, also, Heiter v. East St. Louis, etc., R. Co., 53 Mo. App. 331, 335.]

In October, long before the case's submission on December 9, 1921, plaintiff endeavored to get a stipulation from defendant that the two photographs and the ladder should be before this court as a part of the record, but was unable to obtain same. The missing exhibits had been offered in evidence at the trial by defendant. Plaintiff finally filed a motion in this court to require the defendant to produce said exhibits in court on or before the date of submission of the case; and in the affidavits of the official stenographer and an attorney for plaintiff filed in support of the motion, it appears that the exhibits were never in the possession of the stenographer, that the photographs were large, mounted on stiff carboard, and the stenographer did not attempt to obtain the exhibits from the defendant and attach them to the transcript; that the attorney endeavored to get the exhibits from defendant's counsel in order that they might, as originals, be brought before this court; that defenndant's counsel promised to get them but, though repeatedly asked, failed to do so, telling plaintiff's counsel finally that they were unable to find or locate said exhibits. In an affidavit, defendant's counsel say the photographs were mounted on flexible cloth.

However, we pay little or no heed to whether the photographs were mounted on .carboard or flexible cloth, for although the stenographer says the exhibits were not sought and actually attached to the transcript because it was "impracticable" to attach them, we think it was not impossible to attach the photographs, and it would be a dangerous precedent to allow exhibits to be omitted from a Bill of Exceptions because the stenographer, in getting up same, might deem it "impracticable" to include them. Moreover, there is no formal "call" for the exhibits in the Bill of Exceptions, and for that reason we cannot sustain plaintiff's motion and compel defendant to produce them. For this reason, the motion to require the production of said exhibits, as originals, in this court is hereby overruled. It is true, the only way physical objects, which cannot be actually or physically incorporated in the Bill of Exception, can be made a part of the record is to describe them in the bill. [Morgantown Mfg. Co. v. Hicks, 86 N. E. 856.] It is held in Indiana that such articles have no place in the bill, but the verbal descriptions of them are sufficient. [Bridgewater v. State, 153 Ind. 560; Kingan & Co. Ltd. v. King, 179 Ind. 285.] In Illinois it has been held that a Bill of Exceptions contains all the evidence, if it includes that which was presented at the trial, although objects, persons or scenes of which the jury may have had a view are not contained in it. [Seaverns v. Lischinski, 181 Ill. 358; 4 C. J. 237; Louisville, etc., R. Co. v. Williams, 172 Ala. 560.] In Woodward Iron Co. v. Wade, 68 So. 1008, 1011, it is held that a diagram admitted in evidence but omitted from the Bill of Exceptions, which was fully described in the evidence, could not exert the slightest influence on the question of whether defendant was negligent in giving an order. The Bill of Exceptions shows, in the case at bar, that the said exhibits were introduced in evidence as numbered exhibits, and, defendant's counsel asked his witness to describe the ladder (then before the jury), *so as to get it into the*

*record.* While the photographs were introduced, they were merely passed around for the jury's inspection and nothing seems to have been said about them, but the machine was minutely described by the witnesses in their testimony; and the other photograph was simply of a row of machines similar to the one described and on the door of which plaintiff stood.

We hold that, under the circumstances of this case, on the point involved and because it is manifest there could be nothing appearing in the photographs or about the ladder itself which could settle the foreclosure of plaintiff's right to go to the jury, the plaintiff is not to be turned out of court on the theory that she has failed to bring all of the evidence before us. Neither can we uphold defendant's contention that the record shows appellant's nonsuit was voluntary. The record proper shows that at the conclusion of all the evidence the defendant offered a peremptory instruction in the nature of a demurrer to the evidence, which the court marked "given." And the record then reads, "Thereupon and before final submission and before said peremptory instruction was read to the jury, plaintiff, by leave of the court, took and suffered an involuntary nonsuit with leave to move to set the same aside." The abstract of the Bill of Exceptions shows the same thing, but also sets out the peremptory instruction to find for defendant and says that the court marked it "given" and that "thereupon the court gave said instruction" to which plaintiff excepted. The abstract shows that plaintiff's attorney then made the statement which defendant now claims made the nonsuit a voluntary one. We do not think so, but that when the attorney stated that "before any ruling thereon is made by the court and before any further action is taken in the premises, the plaintiff now and thereupon takes an involuntary nonsuit with leave to file a motion to set the same aside," it means merely that the involuntary nonsuit was taken before the given instruction was read to the jury. The Bill of Exceptions

recited, after this, that the "given" instruction was not read to the jury and that the court granted plaintiff an involuntary nonsuit with leave to move to set the same aside. The record proper derives no force or validity by any recital in the Bill of Exceptions. State ex rel. v. Broaddus, 239 Mo. 359, 367), and certainly its record herein is not disputed or overturned by anything in the Bill of Exceptions. It is not what was said on that occasion, but what was actually done, that determines the matter. [Thomas v. Elliott, 215 Mo. 598, 601-2.] The abstract, both of the record proper and of the bill of exceptions, shows that an involuntary nonsuit was taken from which an appeal will lie. [Kelley, etc., Shoe Co. v. Pickett, 84 Mo. App. 94, 100.]

Being of the opinion that plaintiff was entitled to go to the jury, and that she did not take a voluntary nonsuit and is entitled to have the case heard here on its merits, the judgment is reversed and the cause is remanded for a new trial. All concur.