Louis N. Kepner v. Cleveland, Cincinnati, Chicago & St. Louis Railway Company, Appellant.—15 S. W. (2d) 825.

Court en Banc, March 27, 1929.

300

*S. W. Baxter* and *Charles A. Houts* for appellant; *H. M. Quigley* of counsel.

*Abbott, Fauntleroy, Cullen & Edwards* and *Charles P. Noell* for respondent; *Glen Mohler* of counsel.

304

FRANK, J.—This is an action, under the Federal Employers' Liability Act, for personal injuries sustained by plaintiff while adjusting a sand pipe on a turntable in the repair yards of defendant at Beech Grove, Indiana. Trial to a jury resulted in a verdict for plaintiff in the sum of $50,000, which upon *remittitur* was reduced to $25,000, for which sum judgment was entered, and defendant appealed.

Defendant is a railroad corporation and at the time in question was an interstate carrier operating its line of railroad through the States of Indiana, Ohio, Illinois and Michigan. It maintained its repair yards and shops at Beech Grove, Indiana. These shops consisted of a number of buildings in which defendant's engines, cars and other equipment were repaired. Various switches and tracks were maintained in the repair yards for the convenient handling of the engines and cars brought there for repairs, and for the purpose of conveying such engines and cars into and out of the repair shops. Among the various shops maintained in the repair yards was one for the repair of locomotives only. The turntable upon which plaintiff was injured, was located in front of this locomotive repair shop.

The engine storage yard is located about two hundred yards west of the turntable. Locomotives coming to the shop for repairs are shipped as dead freight to the engine storage yard, and from there conveyed by a yard switch engine over the turntable and into the repair shop. Plaintiff and defendant's witness Jones operated this yard switch engine. The turntable was used for conveying all engines into the repair shop. In this connection, witness Jones testified:

"Q. And your engine, the engine that you and Mr. Kepner worked on, would bring them from the yards into the shop? A. Yes, that was the job we had to do.

"Q. You used the turntable in doing that? A. Yes, on every engine.

"Q. On every engine? A. Yes, if we didn't have to turn the engine we had to put the tank away.

"Q. That was what the turntable was for? A. Yes, sir."

On this same subject, Rothaas, defendant's shop inspector, testified:

"Q. And the turntable is for what purpose? A. For turning locomotives or any equipment going into our shops which needs turning.

"Q. Now, is it used for any other purpose than that which you have just testified? A. No sir."

Prior to July 24, 1923, the day on which plaintiff was injured, he had been in defendant's employ for about five years in the capacity of switchman to assist in the operation of the yard switch engine for the purpose of conveying disabled engines and other equipment from points in the yard to and over the turntable into the repair shop and out again after being repaired.

The turntable was located in a circular pit with a track around the upper part of its outer edge. The turntable was on an iron frame supported at each end by steel wheels which ran on the track referred to. There was a standard-gauge railroad track on this table. When an engine was placed on this track the table was turned in order to connect the turntable track with another track leading into the repair shop, thus permitting the engine to be run into the shop and out again after being repaired. The table was turned by means of an electric motor. This motor and the gears which turned the table were covered by a wooden box which extended a few inches above the table. An iron pipe was fastened to the table directly above the wheels, through which sand was poured on the track upon which the table moved, to prevent the wheels from slipping thereon. If this sand pipe got out of line, it was plaintiff's duty to adjust it.

For some time before plaintiff was injured the boards on the turntable platform covering the gears of the machinery which turned the table had been missing. On the Saturday previous to plaintiff's injuries he reported this defect to defendant's foreman, whose business

it was to make the repairs in question. The latter promised to make the repairs in a day or two. Plaintiff relied upon this promise and continued in his work. On the following Tuesday he had started the turntable for the purpose of sanding the tracks, which was his regular duty. In sanding the tracks, he observed that the sand did not hit the rail and that the sand pipe was out of line. He reached for the lever to shut off the power with one hand, having his wrench in the other hand, and as he did so his foot slipped into the hole in the box covering the gears, and his leg was crushed in the gears in such a way that it had to be amputated. In his fall, his back was twisted and wrenched, causing permanent injuries to the lower lumbar region of the spine.

Other pertinent facts will be stated in course of the opinion.

This action is brought under the Federal Employers' Liability Act. [Chap. 149, 35 Stat. 65, U. S. Comp. Stat. Supp. 1919, p. 1322.] In order to sustain a recovery under this act, plaintiff must show that at the time of his injury he was engaged in interstate transportation or in a work so closely related to it as to be practically a part of it. [Shanks v. Delaware & Lackawanna Railroad Co., 239 U. S. 556, 558, 60 Law Ed. 436, L. R. A. 1916-C, 797.] The character of plaintiff's employment generally, or its character on the day of and prior to his injury, is not determinative of this question. The true test is whether or not he was engaged in interstate transportation within the meaning of the act at the *very time* of his injury.

I. Appellant challenges plaintiff's right to recover under the Federal Employers' Liability Act. The burden is on plaintiff to show that he was employed in interstate commerce within the meaning of such act at the time he was injured.

Plaintiff testified on both direct and cross-examination that interstate engines passed over the turntable on their way into and out of the repair shop. Defendant, however, insists that this testimony was not the statement of a fact, but the expression of a conclusion based upon an erroneous conception of the law by which an interstate character should be determined, and is, therefore, devoid of probative value and no evidence of the interstate character of the engines. It is then insisted that as plaintiff's statement was the only testimony on that subject, there was no evidence that the turntable was a permanent instrumentality of interstate commerce.

We do not so read the record. The evidence shows that disabled engines were brought from other states into the State of Indiana and to the shops at Beech Grove for repairs. Defendant does not dispute this fact, but contends that a disabled engine while being hauled

as dead freight from one state to another was not, at the time of such movement, in commercial use or being used as an instrumentality in the movement of an interstate train, and for these reasons such movement was not a movement in interstate commerce.

There is no merit in this contention. The movement of the engines from one state to another, was a movement in interstate commerce regardless of the purpose for which they were being moved. It has been held that the hauling of empty cars from one state to another is interstate commerce. [Nor. Car. Railroad Co. v. Zachary, 232 U. S. 259, 260.]

In C. R. I. Ry. Co. v. Wright, 239 U. S. 550, a like question is disposed of thus:

"It is entirely clear that taking the *road engine* from Phillipsburg, Kansas, to Council Bluffs, Iowa, was an act of interstate commerce, and that the intestate, while participating in that act, was employed in such commerce. That the engine was not in commercial use but merely on the way to a repair shop is immaterial. It was being taken from one State to another and this was the true test of whether it was moving in interstate commerce. [See North Carolina R. R. v. Zachary, 232 U. S. 248, 259.]"

There are numerous other cases to the same effect. We rule this contention against appellant.

But appellant insists that although the movement of the engines from one state to another was interstate commerce, such interstate movement terminated when the engines reached the yards at Beech Grove, and their subsequent removal to the shops was local and not interstate. Kozimko v. Hines, 268 Fed. 507; Schauffele v. Director Gen., 276 Fed. 115; Lehigh Valley v. Barlow, 244 U. S. 183; C. B. & Q. Railroad Co. v. Harrington, 241 U. S. 177, and Bishop v. Delano, 265 Fed. 263, are cited in support of this.

The cases cited do not support appellant's contention. Their facts differ materially from the facts in this case.

In the Harrington case the facts were that the plaintiff was a member of one of defendant's switching crews, and at the time of his death was engaged in switching coal belonging to defendant, and which had been standing on a storage track for some time, to the coal shed, where it was to be placed in bins or chutes and supplied as needed to all class of engines both interstate and intrastate. Relative to the movement of the coal to the storage track, the court said,

"With the movement of the coal to the storage tracks, however, we are not concerned; that movement had long since ended, as it is admitted that the coal was owned by the Company and 'had been in storage in its storage tracks for a week or more prior to the time it

was being switched into the coal chutes on the morning of the accident.' ''

As we read the Harrington case, the court held that the interstate movement of the coal ended when it reached the storage track, because the coal *was placed in storage on the storage track.* If the destination of the coal had been the chute, and it had been placed in the yards in order that a switch engine could take it to the chute, a different question would have been presented.

The facts in the Barlow case, cited by appellant, are almost identical with the facts in the Harrington case. In the Barlow case the court cited and followed the Harrington case.

In the present action there is no evidence that engines coming from other states to Beech Grove for repairs were placed in storage upon their arrival at the yards. On the contrary the fair inference deducible from the evidence is that the only reason or purpose for placing the engines on the track in the engine yard was to expedite their further journey into the repair shop by use of a yard switch engine. There is no evidence that the engines remained in the yards for any length of time. Defendant's general shop inspector was asked to explain in detail how engines coming to the repair shop were handled. He testified that the engines were shipped as dead freight to the storage yard and that the next step was to convey them to the repair shop by means of a switch engine.

The purpose of the transportation being the repair of the engines, their ultimate destination was necessarily the repair shop, the only place where the repairs could be made. If they had not been temporarily halted in the yards, but had proceeded to and over the turntable and into the repair shop, it could not then be successfully contended that the interstate movement ended before the engines reached the repair shop. This being true, the purpose for which the engines were placed on the track in the yards is important. Had they been stored there, to remain an indefinite length of time, their interstate movement would have ended upon their arrival in the yards, but such was not the situation. The halting of the engines in the yards and their conveyance thereafter into the repair shop by use of a switch engine was nothing more than a plan adopted by defendant for the convenient handling of the engines after they reached the yards, which did not change the destination of the engines or render their movement from the yards to the shop local and not interstate.

A kindred question was presented to the U. S. Supreme Court in St. Louis, etc., Railroad Co. v. Seale, 229 U. S. 156. The question there discussed was whether or not after an interstate train arrived in the yard at its terminal, the movement thereafter of various cars in the train to certain points or tracks in the yard was interstate or intrastate. In disposing of that question the court said:

"The interstate transportation was not ended merely because that yard was a terminal for that train, nor even if the cars were not going to points beyond. Whether they were going further or were to stop at that station, it still was necessary that the train be broken up and the cars taken to the appropriate tracks for making up outgoing trains or for unloading or delivering freight, and this was as much a part of the interstate transportation as was the movement across the state line. [McNeill v. Southern Railway Co., 202 U. S. 543, 559; see, also Johnson v. Southern Pacific Company, 196 U. S. 1, 21.]"

The turntable was permanently used for the taking of engines and other equipment into and out of the repair shop. Defendant's witness Jones, who operated the switch engine, testified that the turntable was used on every engine. Rothaas, defendant's general shop inspector, testified that the turntable was used for turning locomotives and other equipment going into the repair shop, and that it was not used for any other purpose. As the turntable was permanently used for the purposes aforesaid, the interstate movement of engines over it into the repair shop characterized the table as a permanent instrumentality of interstate commerce (Pederson v. Railroad, 229 U. S. 146, 33 Sup. Ct. 648, 57 L. Ed. 1125, Ann. Cas. 1914-C, 153), and as plaintiff was actually working upon such instrumentality at the time he was injured, his case is within the Federal Employers' Liability Act.

II. Complaint is made of the only instruction given for plaintiff. That part of the instruction criticised reads: "that if you find and believe from the evidence that at the time plaintiff was injured . . . he was engaged in repairing and adjusting a sand pipe upon a turntable of defendant, and if you further find that said turntable and sand pipe were used by defendant in moving and turning engines used in interstate commerce," etc.

The criticism is (1), that the instruction in effect told the jury that if the engines in question, before coming to the repair shop, had been used in interstate commerce, they were for that reason still interstate engines and their passage over the turntable characterized it as an instrumentality of interstate commerce, and (2) that it did not inform the jury what facts would constitute the table an instrumentality of interstate commerce.

Appellant admits that engines were brought from other states to the repair shop at Beech Grove. The movement of the engines from one state to another was, as a matter of law, a movement in interstate commerce. [Railway v. Wright, 239 U. S. 550; Railroad v. Zachary, 232 U. S. 259, 260.] There is no dispute about how the engines were handled after reaching the yards at Beech Grove. In this situation, the instruction, if erroneous, was not prejudicial.

III. We gather from the motion to dismiss plaintiff's cause of action filed by defendant that defendant obtained an injunction in the State of Indiana prohibiting plaintiff from further proceeding in this cause. The motion to dismiss being overruled, defendant then set forth equivalent facts in its answer. Upon the trial the defendant sought to introduce the records of the Indiana court to that effect, the court refusing to admit such records. Thereupon defendant made an offer of proof to that effect, which offer the court rejected. It complains of the action of the trial court in that regard because, in violation of the Federal Constitution, full faith and credit was not accorded to the judgment of a sister state. Very few cases have passed on this question and the decisions are not uniform. We think the better rule supports the action of the trial court in this regard. [Frye v. Railroad, 195 N. W. 629 (certiorari denied by U. S. Supreme Court, 44 Sup. Ct. 231); Shaw v. Railroad, 282 S. W. 416; State ex rel. Bossung v. Court, 140 Minn. 494, 168 N. W. 589, 1 A. L. R. 145; Nichols & Shepard Co. v. Wheeler, 150 Ky. 169, 150 S. W. 33.] The contention is ruled against defendant.

IV. It is contended that plaintiff assumed the risk of injury, (1) because it was imminent and known to him, and (2) because he continued to work and was injured after the expiration of the time in which the repairs had been promised.

The rule in this regard is tersely stated in Seaboard Air Line v. Horton, 239 U. S. 595, as follows:

"If, however, there be a promise of reparation, then during such time as may be reasonably required for its performance or until the particular time specified for its performance, the employee relying upon the promise does not assume the risk unless at least the danger be so imminent that no ordinarily prudent man under the circumstances would rely upon such promise."

There was a promise to repair in this case. Plaintiff knew that some of the boards on the box covering the gear were missing and so notified defendant's foreman on Saturday previous to his injury on Tuesday. The foreman promised to make the repairs in a day or two. Plaintiff had a right to rely on the promise to repair and continue to work during such time as might be reasonably required to make the promised repairs, unless the danger in so doing was imminent. The promise was made on Saturday and the injury occurred on Tuesday. Sunday, a non-working day intervened. We cannot say as a matter of law that a reasonable time in which the repairs could have been made had expired before plaintiff was injured. This being true, plaintiff had the right to continue in his work, un-

less the danger of working on the table near the uncovered gears was so obvious and imminent as to threaten immediate injury. Plaintiff's duties did not require him to work on the gears or the covering. The danger to plaintiff in continuing work was that he might become engrossed in the performance of his duties and unwarily step into the gears, or come in contact with them by either slipping or falling on them while in the performance of his duties. These dangers were not so obvious and immediately threatening that we can say, as a matter of law, that it was imprudent for plaintiff to continue in his work pending defendant's promise to repair, and that he assumed the risk of injury in so doing. We rule this contention against appellant.

V. The next and last contention is that the verdict is excessive. The evidence in that regard shows the amputation of the left leg four inches below the hip. Injuries to the back and spine were also shown. The surfaces between the third, fourth and fifth lumbar vertebrae were found irregular and in a fuzzy condition. A portion of the bone has been absorbed. The vertebrae do not articulate smoothly. These findings denote chronic inflammatory changes in the spine which render movement, whether from side to side or front to back, painful. An inflammatory condition of the spine obtained along the spinal column as well as an inflammatory condition of the hip joints and sacroiliac joint, known as arthritis. There is also limitation of motion in the spine which is more or less rigid and stiff, instead of flexible, approaching a state of ankylosis. X-ray pictures tended to show all of this. It was the opinion of the doctors that the condition of the spine is not only permanent, but progressive, and that it will be impossible for plaintiff to wear an artificial limb because of the condition of the lower spine and because of the amputation of the limb just below the hip. Plaintiff was thirty-nine years of age at the time of the injury and was earning $250 a month. Under the American Table of Mortality his expectancy of life was approximately twenty-eight years. From the time of the injury to the time of trial, nearly a year elapsing, plaintiff had been unable to earn anything and testified that his suffering had been and was very painful.

Considering the serious and permanent character of plaintiff's injuries, the physical pain and suffering he endured, his mental suffering resulting from physical disability and the permanent impairment of his earning capacity, we regard a recovery of $25,000 reasonable. That amount received the sanction of the trial court, and we cannot say that the amount recovered is so out of proportion to the injury sustained as to indicate passion and prejudice on the part of the jury, or warrant our disturbing it.

312

Finding no reversible error in the record, the judgment is affirmed. *White, C. J.*, and *Gantt, Atwood* and *Ragland, JJ.*, concur; *Blair, J.*, dissents; *Walker, J.*, dissents in a separate opinion.

WALKER, J. (dissenting):—I do not concur in the reasons adduced or the conclusion reached in the majority opinion.

The correctness, in the main, of the statement of the case made by my learned associate, I do not question. I do not, however, deem it inappropriate to state the facts, as I read this record, prefatory to a discussion of the applicable law.

The plaintiff, at the time of his injury, had for five years been employed as a switchman by the defendant. When the accident occurred, which resulted in the loss of one of the plaintiff's legs, he was working for defendant in the yards of its repair shops at Beech Grove, Indiana. These shops consisted of a number of buildings devoted to the repair of defendant's locomotives or engines and cars used on its road. In front of what is designated as the engine repair shop was a turntable, upon which the plaintiff was injured. This turntable was located in a circular pit with a track around the upper part of its outer edge. The table was on an iron frame, supported at each end by steel wheels which ran on the track referred to. On this table there was a standard-gauge railroad track upon which engines would be placed to be turned around to connect the turntable track with a track beyond the pit, and thus permit the engine to be run to a shop for repairs, or to some other point in the yards after being repaired, or out upon the main tracks of the defendant's right of way. The table was operated with a lever located at one of its ends, the lever projecting several feet above the surface. The motive power in the operation of the table was electric. Over the electric motor and the gears there was a wooden box or housing which extended a few inches above the table. Directly over the wheels of the table and attached to it was an iron pipe, the purpose of which was to pour sand on the track upon which the table moved.

For some time before the plaintiff's accident the boards on the turntable platform covering the gears of the machinery which turned the table had been missing. On the Saturday previous to plaintiff's injuries he reported this defect to defendant's foreman, whose business it was to make the repairs needed. The latter promised to make the repairs in a day or two. Plaintiff relied upon this promise and continued in his work. On the following Tuesday he had started the turntable for the purpose of sanding the tracks, which was his regular duty. These tracks were sanded by plaintiff at regular intervals, two or three times per week, in order that engines using the turntable would not slip on the rails. In sanding the tracks, he observed that the sand did not hit the rail and that the sand pipe was out of line.

He reached for the lever to shut off the power with one hand, having his wrench in the other hand, and as he did so his foot slipped into the hole in the platform, and his leg was crushed in the gears in such a way that it had to be amputated. In his fall, his back was twisted and wrenched, causing the permanent injuries to the lower lumbar region of the spine.

When the plaintiff received his injuries he was employed with a fellow-workman, named Jones, on an engine of the defendant which the latter stated was used exclusively in the repair yards for switching purposes in getting engines and other equipment in and out of the yards. When engines arrived at the yards for repairs they were disconnected from their tenders and their use on the road as a motive power in moving trains was discontinued. When engines were transferred from any part of the road to Beech Grove for repairs they were brought there as dead freight, never under their own power. When the repairs had been completed they were connected with their tenders, run onto the turntable and headed out of the yards for use in the transporting of defendant's trains. The switch engine upon which the plaintiff and Jones were employed was confined in its operation to work within the repair yards. Corroborative of the testimony of Jones, the general shop inspector of the defendant testified that when engines were brought to the yards for repairs they were conveyed to that point as dead freight, i. e., they were not brought there under their own power, nor as instrumentalities in the operation of the road. Upon their arrival they were placed in storage yards and from there after they had been disconnected from their tenders they were taken by the switch engine to the repair shop. The witness then described in detail, not necessary to be repeated here, the manner in which engines were brought into and taken out of the yards for repairs, which was the sole reason of their being there and that while there they were out of service.

I. The plaintiff declares under the Federal Employers' Liability Act, approved April 22, 1908. [Chap. 149, 35 Stat. 65, U. S. Comp. Stat. Supp. 1909, p. 1322.] His right to recover, therefore, must be measured by the terms of that act.

The question to be determined is, was the plaintiff, at the time of his injury, employed in interstate commerce within the meaning of the Employers' Liability Act, or in work so closely related to that character of employment as to be practically a part of it. The language of the act (Secs. 1 and 2), declaratory of the Common Carrier's Liability, is that the carrier shall be "liable in damages to any person suffering injury while he is employed by such carrier in such commerce." There is no dearth of cases construing this statute. The United States Supreme Court

has, in a number of instances, discussed and defined the limitations of the portion of the act above quoted. In Shanks v. Delaware & Lackawanna Railroad Co., 239 U. S. 556, 558, 60 Law Ed. 436, L. R. A. 1916-C, 797, the court held that the true test of employment in such commerce in the sense intended, is, was the employee at the time of the injury engaged in interstate transportation, or in a word, so closely related to it as to be practically a part of it? The court, in a further discussion of the act in the case cited held in effect that what Shanks' employment was on other occasions is immaterial for, as before indicated, the act refers to the service being rendered when the injury was suffered. That it refers not to the service being rendered in general by the employee, nor that being rendered on the day of the injury, but to the service being rendered at the very time of the injury.

In the case of Ill. Cent. Railroad v. Behrens, 233 U. S. 473, 58 Law Ed. 1051, Ann. Cas. 1914-C, 163, the court held that: "It is clear that Congress intended to confine its action to injuries occurring when the particular service in which the employee is engaged is a part of interstate commerce. . . . The true test always is: Is the work in question a part of interstate commerce in which the carrier is engaged?"

The case of Pederson v. Delaware, Lack. & Western Railroad Co., 229 U. S. 146, 57 Law Ed. 1125, Ann. Cas. 1914-C, 153, states the correct conclusion as to the limitations of the statute, but bases the plaintiff's right of recovery upon a construction as to what constitutes the instrumentalities of interstate commerce, which instrumentalities, in the opinion of the writer, with due respect for the high court which rendered the decision, cannot properly be so classified. In short, the instrumentalities used by Pederson, at the time of his injury, had no such immediate connection with interstate commerce as is meant by the statute. Pederson and another employee under the direction of a foreman, were, when Pederson was injured, carrying some iron bolts from a tool car to be used the next day in repairing a bridge. From this fact it is reasoned in the majority opinion that as the bolts were to be used in the repairing of the bridge, and as the latter was an instrumentality of interstate commerce, the bolts became by reason of their destined use likewise such instrumentalities. A vigorous dissent to this conclusion by three of the members of the court properly recognized the limitations of the statute, and is in harmony with reason, measured by the average experience of men. However, if it be conceded that the facts in that case may be so construed as to sustain the verdict rendered therein, it cannot, when these facts are compared with those in the instant case, be held that the Pederson case is a precedent determinative of the case at bar. The facts are different. The nature of the plaintiff's employment in

the instant case and the character of the work he was engaged in when injured, bore no relation, near or remote, to the defendant's activities as a carrier of interstate commerce. He was employed in a repair yard; his duties were principally those of a switchman on an engine used exclusively in moving engines and cars from one part of the yard to another which had been brought there for repairs. A part of the plaintiff's duty was the operation of a turntable on which he received his injuries. This turntable was used solely in turning about engines which had been brought there for repairs. Conceding that they had been used in interstate and intrastate commerce, it is shown that they were never brought to the yards under their own power, but as dead freight; and that the sole purpose of bringing them there was that they might be repaired. The lack of connection of the engines with plaintiff's injuries is so remote, therefore, as to render an explanatory statement of their use when under repairs irrelevant, except to emphasize such remoteness in determining the plaintiff's right of action under the statute.

II. We are left, therefore, to a consideration of the question whether the work being performed by the plaintiff on the turntable at the time he received the injuries was a part of interstate commerce or so immediately connected therewith as to be practically a part of it. The use of the turntable was limited to the turning about of engines brought in for repairs. Brought in as dead freight they were necessarily placed upon the turntable by the switch engine kept there for that purpose, and, so far as the record discloses, for that alone. There was no engine on the turntable at the time of the accident, and plaintiff's injuries were caused by his starting the electric motor and inadvertently stepping into the gears or machinery connected with the movement of the table. The use of the latter, limited as stated, cannot within the letter and spirit of the act (both of which we may consider in determining its purpose), be held to authorize this action. That the turntable was an instrumentality operated by the defendant it may be admitted. While railroads are generally engaged in interstate commerce it is not every instrumentality employed by them that may be said to be connected with such commerce within the meaning of the law. The turntable not being used as an instrumentality of interstate commerce the plaintiff while operating the same cannot be said to be so connected with such commerce as to entitle him to sue and recover under the Federal Act. Especially is this true where in the entire scope of the plaintiff's employment by the defendant there is no fact showing his connection with the defendant's activities in interstate commerce, such as is contemplated by the statute. A review of many cases, if cursorily considered, leads to the

conclusion that the rulings therein on the question of the application of the act, especially in the Federal courts, is in inextricable confusion. A careful consideration of those cases, however, will demonstrate that, unless the facts have been misinterpreted, the final test is, whether the injury complained of was within the terms of the act or so connected therewith as to become a part of the interstate activity of the defendant. Cases illustrative of the non-application of the act are as follows:

Employees engaged in constructing a semaphore and depot to be erected in the place of others, and to be used in interstate as well as intrastate commerce, do not come within the Federal Employers' Liability Act, as defined in Sections 8657-8665, U. S. Comp. Stat. [Williams v. Schaff, 282 Mo. 497, 222, S. W. 412.]

In Fenstermacher v. C. R. I. & P. Ry. Co., 309 Mo. 475, 274 S. W. 718, it is held, after a discriminating review of many cases, that an employee of a carrier engaged in interstate commerce, who was injured while loading telegraph poles on cars whence they were to be taken to repair a telegraph line used by the railroad in the transaction of business, was not engaged in interstate commerce within the meaning of the act at the time of his injury.

A carpenter injured while repairing a stove pipe to be used in a round house where engines employed in interstate commerce were sheltered, was not employed in interstate commerce. [Dunn v. Mo. Pac. Ry. Co., 190 S. W. (Mo.) 966.]

An employee of an interstate road when injured in the discharge of his duties does not come within the purview of the act, unless the work he is performing at the time is so connected with interstate traffic as to necessarily become a part of it. [Manes v. St. L. & S. F. Ry. Co., 205 Mo. App. 300.]

In Brock v. C. R. I. & P. Ry. Co., 305 Mo. 502, 266 S. W. 691, the court declares generally that an employee, to bring his right of action within the terms of the Employers' Liability Act, must, at the time of his injury, be engaged in work interstate in character or so nearly related thereto as to practically be a part of it, as in repairing an instrumentality then in use in interstate transportation.

In the case of Industrial Accident Commission v. Davis, 259 U. S. 182, it was held that where an engine employed exclusively in interstate commerce was sent to the shops for repair and a workman was injured while engaged in such repairs, he could not recover under the Interstate Commerce Act, although when repaired the engine was to be returned to interstate service. This case cites with approval the Shanks case, supra, and C. B. & Q. Ry. v. Harrington, 241 U. S. 177.

In Buck v. C. M. & St. P. Ry. Co., 153 Wis. 158, the court held that, as regards appliances and instrumentalities used by a common carrier

in the business of transportation, it is the use to which it is put at the time, rather than the nature of the instrumentality, which determines whether it is employed in interstate commerce. This was a case in which an employee was injured while repairing a boiler used on a wrecking train which was operated at times in other states, and it was held that thus occupied the employee was not engaged in interstate commerce.

In Herzog v. Hines, 95 N. J. L. 98, 112 Atl. 315, it was held that an employer who was injured while repairing a car temporarily withdrawn from service, but which had been indiscriminately used in intrastate and interstate service, was not engaged in interstate commerce.

In C. & A. Ry. Co. v. Allen, 249 Fed. 280, it was held that a shopman injured while engaged in the general overhauling and repairing of an engine that had been used both in intrastate and interstate commerce and was intended to be thereafter so used when repaired, was not necessarily engaged in interstate commerce.

III. If precedents, as nearly parallel in their facts as the multifarious occurrences of every day life will permit, may be held to obtain, the conclusion is authorized that under all of the circumstances in the case at bar the plaintiff was not engaged in interstate commerce at the time of his injury, or so nearly connected therewith as to bring him within the terms of the Employers' Liability Act. The connection of the turntable with the interstate activity of the defendant in this case was, in our opinion, too remote to bring the plaintiff within the purview of the act. There are of course conditions under which a turntable could be held to sustain such a close relation to interstate transportation as to bring one receiving injury while operating the same, within the terms of the act. Semble: if the employee was, at the time of the injury, operating or repairing a turntable on which engines hauling interstate trains or trains carrying interstate and intrastate freight were turned, upon entering or leaving a round house before and after trips, the status of the injured employee might properly be held to be within the terms of the act. [1 Robert's Federal Liabilities & Carriers, sec. 475, p. 824.] No such conditions exist here. The character of the plaintiff's employment was well defined. It was local and limited to the repair yards and his sole relation to the carrier's business was that he was in its employment and it was engaged in interstate business with which he had no connection. If the turntable he was attempting to operate had been operated to turn engines used in interstate and intrastate transportation a basis would, as suggested, exist for plaintiff's right of action under the statute, but where engines are withdrawn from service and are in the yards for

repair the right does not exist. [Minn. & St. Louis Ry. Co. v. Winters, 242 U. S. 353; Heimbach v. Lehigh Valley Ry. Co., 197 Fed. 579; C. R. I. & P. Ry. Co. v. Cronin, 176 Pac. (Okla.) 919; Cent. Ry. Co. of New Jersey v. Paslick, 239 Fed. 713; Payne v. Demott, 26 Ga. App. 314, 106 S. E. 9; New Orleans & N. E. Ry. Co. v. Beard, 128 Miss. 172, 90 So. 727.]

In view of all of which the holding is authorized that the use of the turntable was too remote from the interstate character of the road to bring the plaintiff within the terms of the act, and the judgment of the trial court should be reversed and remanded that such action may be taken therein as is warranted by the law and the facts.