Patrick Wetterer, Appellee, v. The Atchison, Topeka
and Santa Fe Railway Company, Appellant.

Gen. No. 36,786.

276

Opinion filed October 24, 1934.   Rehearing denied and opinion modified November 15, 1934.

EMMET TRAINOR and F. W. MILLER, for appellant; CHARLES H. WOODS, of counsel.

FINN & MILLER, for appellee.

MR. PRESIDING JUSTICE HEBEL delivered the opinion of the court.

This is an appeal by the defendant from a judgment entered in favor of the plaintiff in the sum of $23,500, upon a verdict of a jury recovered in an action of trespass on the case instituted under the Federal Employers' Liability Act, Cahill's St. ch. 114, ¶ 321 *et seq.*, by the plaintiff against the defendant to recover damages for injuries sustained by him on June 8, 1931, while he was assisting in the unloading of scrap rail from a freight car in the defendant's Corwith yard in Chicago, which rail was consigned to the defendant at Chicago, Illinois.

In the declaration the plaintiff alleges that while he was engaged in unloading an interstate shipment of steel rails in defendant's scrap yards, defendant's craneman, employed by it, negligently moved the car that was being unloaded, causing certain of the rails then piled on the ground to fall upon the plaintiff. The second count alleges that the craneman negligently moved the car without warning the plaintiff. The first additional count alleges that one of defendant's employees negligently signaled the crane operator to move the car, thereby causing the rails to fall upon the plaintiff.

To the plaintiff's declaration the defendant filed a plea of the general issue, an additional plea of assump-

tion of risk, and a second additional plea alleging that prior to the commencement of the suit plaintiff had agreed to accept as payment for the injuries sustained by him the amount prescribed by the Illinois Workmen's Compensation Act, Cahill's St. ch. 48, ¶ 201 *et seq.*; that the amount so provided for by the statute was to be paid at the time and in the manner prescribed by the act, and further, that the plaintiff had accepted numerous payments under said settlement, both prior and subsequent to the commencement of the suit, which payments totaled the sum of $988.

Plaintiff demurred to defendant's second additional plea, which was sustained by the court.

From the facts in evidence there was located in defendant's yard, used for the purpose of unloading freight cars which contained miscellaneous rails, a traveling crane owned by the defendant. This crane consisted of an overhead structure supported on two parallel rows of upright steel columns placed about 50 feet apart. On the top of each of the parallel structures was a track consisting of two rails from end to end of the structure. The crane in question consisted of a bridge extending from the structure and was constructed from the side of the uprights. There was underhung at one end of the bridge a cab, inside of which was stationed the crane operator. There was also hung from the under side of the bridge a large magnet which moved from side to side and up and down, as occasion required, by means of a cable attached to a drum. Toward the west side of the structure was located a railroad track upon which the cars to be unloaded by the crane were stationed. The rails in question were old, and varied in length from 29 to 33 feet. On the day in question plaintiff and the man with whom he was working had unloaded two cars of rails before the accident happened. They commenced building the pile of rails at the east side of the over-

head structure on which the crane operated, and as the unloading progressed the pile was completed further to the west. The highest point of the rail pile was at the east end and varied, according to the testimony of witnesses, from 6 to 15 feet in height. The pile sloped from the east to the west, and, in order to prevent the rails from sinking into the ground, at various points there were placed two parallel steel rails running in an easterly and westerly direction, and called "skids." It was the practice to spot the loaded car at these skids, and by means of the magnet unload the rails from the car, the rails lying in a northerly and southerly direction and piled to the desired height, the pile being highest in the center. The men assisting in the work each had an appliance which was called a hook, and it was their duty to straighten the rails on the pile so as to keep them as even as possible.

The plaintiff testified that after car NKP-70170 was unloaded, a number of the rails were disarranged and lying crosswise on the pile, and one of the rails projected from the pile under the said freight car, just south of the north trucks thereof; that the plaintiff called to the crane operator not to move the car until the rails were straightened out, but the crane operator disregarded his request and proceeded to drop the magnet into the empty car; that the craneman pulled the car to the south a short distance by means of the crane, which was attached to the magnet; that when the car moved, the north truck thereof caught the rail which projected under the car and moved the rail to the south, and the movement of said rail caused the other rails, which were in contact with the rail to be dislodged and to roll or fall from the pile, and the rails struck the plaintiff and caused the injuries, damages for which the plaintiff instituted his suit.

At the time of the injury plaintiff suffered a fracture through the transverse process of the fourth and fifth

lumbar vertebrae; fracture of the seventh, eighth, ninth and tenth ribs; and the ninth rib was also fractured on the opposite side; a fracture through the neck and also a fracture through the head of the left radius (elbow joint); and another fracture of the radius five inches below the first; a transverse and comminuted fracture containing many fragments, through the olecranon process of the left ulna (elbow joint); also a fracture of the left ulna, below the elbow joint. Some of these fragments at the elbow joint were distributed through the soft tissue, and one of the witnesses, a physician called by the defendant, testified that the hand was held in extension; the fingers in extension and the thumb in adduction, the thumb being turned in toward the palm of the hand. There was a limitation of flexion and extension of the elbow joint, limitation of flexion and extension of the wrist joint, inability to pronate and supinate the forearm except to a slight degree; inability to flex the fingers except the terminal phalanges of the fingers to a slight degree; that the first phalanx of the little finger was overextended and the second and third phalanx of the little finger were markedly flexed; that there was a loss of function of some of the muscles of the forearm, hand and fingers, together with a shortening of some of the tendons. He was suffering from a condition known as ischemic paralysis, a paralysis that is due to a disturbance primarily in the blood supply to the muscles involved, in which the muscle fibre becomes infiltrated with connective tissue and the muscle fibre itself disappears, and there remain largely connective tissues that take the place of the normal muscle fibre, and this witness testified that the condition was permanent and progressive.

The injuries to the plaintiff were sustained on June 8, 1931, while working in the north end of defendant's scrap yard, or reclamation plant, as it is sometimes called.

The yards were laid adjacent to and on the west side of defendant's Corwith switch yards in Chicago, Illinois. The scrap yards are separated from the Corwith switch yards by a fire road running in a north and south direction. These scrap yards were maintained for the purpose of collecting and classifying rails, and eventually selling material which had been scrapped by the defendant company,—old material for which the defendant had no further use and which was sent there from various points of the defendant's line. The yards contained numerous buildings which contained machinery and which were connected by tracks.

The tracks in the scrap yard were laid out in a north and south direction, and were numbered numerically for the purpose of identifying them. The tracks in this yard converged from a lead track, which was connected with the tracks in the Corwith switch yards, three of which tracks were known as Nos. 26, 27 and 28, and were used for the purpose of receiving incoming cars of freight. Another track at the west side of the scrap yard was used for outbound freight. The cars loaded with scrap rail were consigned to the scrap yards, and were placed on the receiving tracks by the Corwith switch engines. After the cars destined to the scrap yards were placed on the receiving tracks they were moved by a switch engine assigned to the scrap yards. This engine did not operate in the Corwith switch yards, nor did the Corwith switch engine operate within the scrap yards. Car No. NKP-70170, which was the car plaintiff assisted in unloading, immediately prior to the time of the accident, arrived at the Corwith switch yards in a train consisting of 128 cars at 1:35 a. m. on the morning of June 6, 1931. The record shows that this car originated in Conroe, Texas, and was switched to the receiving tracks of the scrap yards, consigned to G. C. & S. F. Ry. Co., c/o R. K. Graham, an employee of the defendant. The scrap

yards did not operate on Saturdays and Sundays, June 6th and 7th during the month of June, 1931, but the Corwith switch yards did.

On the morning of June 8, 1931, Mr. Thompson, the weighmaster at the scrap yards, in accordance with his usual custom, made a check of all the cars on the receiving tracks in the scrap yards and noted them in his records. Car No. NKP-70170 was among the cars which he found on the receiving tracks in the scrap yards on that morning.

The important question is as to the character of the shipment. Was the character of the shipment changed to intrastate transportation when the car in question arrived at the Corwith switch yards on June 6, 1931, and was switched to the reclamation plant yard? The evidence tends to establish that on Saturday and Sunday following the arrival of the car, the unloading crew did not work, and it also shows that the car was on the scrap yard track for the purpose of unloading on June 8, 1931; that it was switched on that date to the north end of the switch track and was being unloaded when the accident occurred and the plaintiff was injured.

This question has been before courts of appeal, and the rule is that when a car is engaged in interstate transportation and received by the consignee and stored without unloading, the character of the transportation is changed. This was not the fact, however, in the instant case. The car was switched onto the track in the reclamation yards to be unloaded, in order that the freight car might be returned for the purpose of carrying freight for transportation. The arrival of the car at the Corwith switch yards on June 6, 1931, was but an interruption, and the car was still engaged in interstate transportation and the shipment was not completed until unloaded. In a somewhat analogous case, the Supreme Court of Illinois, in the case of *Pipal*

*v. Grand Trunk Western Ry. Co.,* 341 Ill. 320, where a certiorari was denied by the U. S. Supreme Court, said:

"Defendant's contention is that plaintiff at the time of the injury was not engaged in interstate commerce or in work so closely related to it as practically to be a part of it; that the cars from which the rails were being unloaded were shipped from Michigan, consigned by bill of lading to Nolan, the consignee, at Blue Island, and that after the cars reached their destination at Blue Island their interstate character ceased and the unloading of them was not an act of interstate commerce; that the cars had reached their destination when they arrived at Blue Island, and moving them to 139th street for unloading was an intrastate or local switching movement."

The court in passing upon the question said:

"Defendant relies very much upon *Chicago, Burlington and Quincy Railroad Co. v. Harrington,* 241 U. S. 177, and *Lehigh Valley Railroad Co. v. Barlow,* 244 id. 183. These two decisions do not control this case. In the *Harrington* case coal was brought from a foreign State into defendant's yards at Kansas City, Missouri, where it remained on storage tracks for more than a week and was then moved to a coal chute for unloading. The coal was owned by the railroad company, and after storage for a week or more was being switched to the chutes for unloading when the accident occurred to the plaintiff, who was a member of the switching crew. The court held the movement from the storage tracks to the chute for unloading was an intrastate haul. In the *Barlow* case cars of coal shipped from the State of Pennsylvania were placed on the railroad company's switch and sidetracks in its yards at Cortland, New York, where they remained for seventeen days and were then moved by a switching crew to a trestle within defendant's yards for un-

loading. The injury to Barlow, who was a member of the switching crew, occurred while the cars were being moved to the unloading trestle. The court held that the interstate movement terminated before the cars left the siding where stored. In the case at bar the consignee of the cars, Nolan, knew the cars were coming. They arrived between four and five in the morning of August 6, and a few hours afterward they were placed by the railroad yardmaster and his switching crew on the hold-track at Blue Island and Nolan learned of their arrival that day. He ordered them removed to 139th street for unloading. According to the testimony that was the only place to unload them and make it convenient for the subsequent use of the rails. Placing the cars on the hold-track was but a temporary interruption of the interstate shipment and did not terminate its character.''

In the case of *Wagner v. Chicago, R. I. & P. Ry. Co.*, 277 Ill. 114, the court said, which is pertinent to the question before us:

''It is further urged as a matter of law that if the cars had been employed in interstate commerce they had been delivered and the interstate character of the shipment had ceased. The Gould car had been taken to the Quaker Oats mill and partly unloaded and it became necessary to move it in its partly unloaded condition, but it was again to be returned to complete the unloading and was then to be loaded by the Quaker Oats Company for a shipment to Pennsylvania. The service of the car in interstate commerce had not been completed and the car was still engaged in interstate commerce.''

In the case of *Godby v. Wilson*, 203 Ill. App. 612, in which the facts are somewhat similar, the court in passing upon the question raised, said: ''The ties with which it was loaded were purchased by the receivers in Missouri and elsewhere, outside of the State

of Illinois, and were shipped from St. Louis to the receivers at East St. Louis in care of one E. E. Barrow, who was the agent of the receivers for the distribution of ties which it purchased. As soon as the car reached East St. Louis, instructions were asked of him and he directed it to be sent to Pekin in care of Dyson, who was the foreman of the section crew to which appellee belonged. . . . The original bill of lading was to receivers, care of Barrow, the officer who had charge of the distribution of such ties, and with the intention that Barrow should designate the point to which they should be sent. Accordingly the original bill of lading was amended in red ink instead of preparing a new bill, and by the amendment the car was to go to Pekin in care of Dyson, the section foreman.'' And the court in that case held that the original shipment, which was being unloaded, from the freight car was continuous, and that the plaintiff was still engaged in interstate transportation at the time he was injured.

The case of *Jonas v. Missouri Pac. R. Co.* (Mo. App.), 48 S. W. (2d) 123, in which the writ of certiorari was denied by the United States Supreme Court, is another case where ties were being unloaded from coal cars at the time the plaintiff was injured. The court said:

''The facts show that plaintiff was injured while unloading wooden ties from coal cars, by one of the ties slipping off the side of defendant's car and falling upon him. The work was being done by plaintiff and several of defendant's employees in defendant's yards in Leavenworth, Kansas. The cars of ties had been shipped in from another state and had been in the yards 'one or two days' before they were unloaded. The ties were to be used in 'new' work of defendant, 'putting in power switches and the ties probably came in before they got ready to use them,' and they were being unloaded so that the cars could be sent 'out on

other work.' 'The idea was to get them out of the cars, release them (the cars) . . . if you hold them too long, you have to pay penalty.' At the time plaintiff was injured the ties were being thrown from the car to the ground where they were to be stored for future use by defendant. . . .

"Defendant argues that the 'cars containing the ties had been placed upon a storage track several days before the unloading operation.' Defendant further says: 'The handling of the ties constituted a new movement entirely and said work was as independent of the original movement as the movement of the car to another place would have been.' Defendant admits that the length of time the cars had been in the yard is not material. . . .

"We have examined the cases of *Cruse v. Chicago, R. I. & P. Ry. Co.,* 133 Kan. 340, 299 P. 624; *Chicago, B. & Q. R. Co. v. Harrington,* 241 U. S. 177, 36 S. Ct. 517, 60 L. Ed. 941; *Pierson v. New York, S. & W. R. Co.,* 83 N. J. Law 661, 85 A. 233; *Lehigh Val. R. Co. v. Barlow,* 244 U. S. 183, 37 S. Ct. 515, 61 L. Ed. 1070, and like cases, cited by the defendant and find them not in point. Those cases involved shipments which had arrived at their destination, and the goods or material constituting the particular shipment had been stored and the employee was injured in taking the material to the point where it was to be delivered or used, or in unloading it there. In other words, the interstate character of the shipment ceased at the time of the storage of the goods.

"(1) As before stated, there is no evidence in the case at bar that the cars containing the ties were placed in storage on the switch track, but the inference to be drawn from the testimony is to the contrary. If these cars loaded with ties had been stored on a siding to remain there an indefinite length of time before being unloaded another situation might have

been present. But the inference from the testimony is that it was the purpose to unload the cars as soon as possible. We think the interstate character of the shipment had not ceased when plaintiff was injured. *Swain v. Terminal R. R. Ass'n,* 220 Mo. App. 1088, 291 S. W. 166; *Baltimore & O. S. W. R. Co. v. Burtch, supra; Kepner v. Cleveland, C. C. & St. L. Ry. Co.,* 322 Mo. 299, 15 S. W. (2d) 825, 65 A. L. R. 599; *Rhodes v. Iowa,* 170 U. S. 412, 18 S. Ct. 664, 42 L. Ed. 1088; *Cox v. St. Louis & S. F. R. Co.,* 111 Tex. 8, 222 S. W. 964. . . .

"(3) Under all the controlling United States authorities, and doubtless all others so far as now known, unless the shipment in the car or cars has been received by the consignee and stored without unloading, so as to cause the interstate transportation to be then at an end, the interstate transportation is not terminated until the shipment has been delivered to, or received by, the consignee and unloaded. 2 Roberts on Federal Liability of Carriers, p. 1435, secs. 747, 755; *Moran v. Central R. Co.,* 88 N. J. Law 730, 96 A. 1023 (affirmed by U. S. Sup. Court Mem. Opinion, 245 U. S. 629, 38 S. Ct. 62, 62 L. Ed. 519); *Kepner v. Cleveland, etc., Ry. Co.,* 322 Mo. 299, 15 S. W. (2d) 825, 65 A. L. R. 599. . . .

"In *Covington Stock Yards Co. v. Keith,* 139 U. S. 128, loc. cit. 136, 11 S. Ct. 461, 463, 35 L. Ed. 73, the court says: 'The transportation of live-stock begins with their delivery to the carrier to be unloaded upon its cars, and ends only after the stock is unloaded and delivered, or offered to be delivered, to the consignee.'

"(4) The rule as to when the interstate transportation ends applies where carrier and consignee are the same. This makes no difference. *Swain v. Terminal R. R. Ass'n,* 220 Mo. App. 1088, 291 S. W. 166; *Cruse v. Chicago, etc., R. Co.,* 133 Kan. 340, 299 P. 624; *U. S. v. Benson,* 234 U. S. 548, 34 S. Ct. 956, 58 L. Ed. 1459;

*Public Utilities Comm. v. Landon,* 249 U. S. 236, 245, 39 S. Ct. 268, 63 L. Ed. 577.

"It is clear, in the case now under consideration on the motion for rehearing, that the car containing the ties had not been set on a storage track, but that it was on an industrial switch track which was in constant, or at least frequent, use, and that the defendant (although the car had been there 'one or two days' before being unloaded) was endeavoring to unload it as soon and as fast as possible so as to allow the car to return to the work of transportation from which it came. Consequently, as said in the opinion, the 'interstate character of the shipment had not ceased when plaintiff was injured.' Certainly, under the evidence in the record, we are not in a position to gainsay that proposition. The motion for rehearing must, and is, therefore, overruled. All concur."

The defendant cites many authorities in support of its theory that this case is not governed by the Federal Employers' Liability Act, Cahill's St. ch. 114, ¶ 321 *et seq.,* but is governed by the Workmen's Compensation Law of Illinois, Cahill's St. ch. 48, ¶ 201 *et seq.* First, it is contended that the interstate character, if any, of the shipments of rail which plaintiff had assisted in unloading just prior to the time the injury was sustained, had ceased and terminated prior to the time plaintiff began his work; second, that the work in which plaintiff was engaged at the time of the accident and just prior thereto, was not so closely related to interstate transportation as to be a part thereof, and among the authorities cited is the case of *Chicago & N. W. Ry. Co. v. Bolle,* 284 U. S. 74, which was a case under the Federal Act. In that case the plaintiff was engaged as a fireman to keep up the fires in a stationary boiler of the defendant company to supply steam for the purpose of heating the passenger depot and adjacent buildings, and also the interstate and

suburban passenger coaches standing in the yards. At the time of the accident the stationary engine in one of the buildings of the defendant was out of order and a locomotive engine was being used as a substitute. The locomotive which the plaintiff had been firing was attached to several other engines and hauled several miles to the coal chutes for the purpose of loading coal, and while the coal was being loaded in one of the engines, the plaintiff was injured. The court said in its opinion:

" 'Having in mind the nature and usual course of the business to which the act relates and the evident purpose of Congress in adopting the act, we think it speaks of interstate commerce, not in a technical legal sense, but in a practical one better suited to the occasion (see *Swift & Co. v. United States,* 196 U. S. 375, 398), and that the true test of employment in such commerce in the sense intended is, was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it.'

"It will be observed that the word used in defining the test is 'transportation,' not the word 'commerce.' The two words were not regarded as interchangeable, but as conveying different meanings. Commerce covers the whole field of which transportation is only a part; and the word of narrower signification was chosen understandingly and deliberately as the appropriate term. The business of a railroad is not to carry on commerce generally. It is engaged in the transportation of persons and things in commerce; and hence the test of whether an employee at the time of his injury is engaged in interstate commerce, within the meaning of the act, naturally must be whether he was engaged in interstate transportation or in work so closely related to such transportation as to be practically a part of it. . . .

"Plainly, the respondent in the present case does not bring himself within the rule. At the time of receiving his injury he was engaged in work not incidental to transportation in interstate commerce, but purely incidental to the furnishing of means for heating the station and other structures of the company. His duty ended when he had produced a supply of steam for that purpose. He had nothing to do with its distribution or specific use. Indeed, what he produced was not used or intended to be used, directly or indirectly, in the transportation of anything. It is plain that his work was not in interstate transportation and was not so closely related to such transportation as to cause it to be practically a part of it."

The true rule which is to be applied in cases of this character is defined by the court in the case of *New York, N. H. & H. R. Co. v. Bezue,* 284 U. S. 415, where the court said:

"The criterion of applicability of the statute is the employee's occupation at the time of his injury in interstate transportation or work so closely related thereto as to be practically a part of it."

The application of this rule to the facts as they appear in this record demonstrates that the plaintiff at the time of his injury was engaged in interstate transportation work which was closely related and practically a part of the transportation. The necessity for the unloading of the rails or freight car was as much a part of the transportation as the loading.

The next point to be considered is: Did the plaintiff assume the risk, in the unloading, of rails falling or sliding against him? It is the contention of the defendant that the rules relating to the assumption of risk are well known, and have been often repeated by the Supreme Court of the United States, and one of the cases which the defendant cites is that of the *Seaboard Air Line Ry. v. Horton,* 233 U. S. 492. "Some

employments are necessarily fraught with danger to the workman—danger that must be and is confronted in the line of his duty. Such dangers as are normally and necessarily incident to the occupation are presumably taken into the account in fixing the rate of wages. And a workman of mature years is taken to assume risks of this sort, whether he is actually aware of them or not. But risks of another sort, not naturally incident to the occupation, may arise out of the failure of the employer to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work. These the employee is not treated as assuming until he becomes aware of the defect or disrepair and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them. These distinctions have been recognized and applied in numerous decisions of this court.''

In the discussion of this question it is well to have in mind that section of the Federal Employers' Liability Act:

''Every common carrier by railroad while engaging in commerce between any of the several States or Territories, . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier.'' Cahill's St. ch. 114, ¶ 321.

Prior to the time of the injury, the plaintiff was straightening rails on the ground and removing such rails as were under the wheels of the freight car that had been unloaded. This work was a part of his employment. When the crane operator started to operate the crane in the direction of the unloaded freight car while the workmen were working on the ground,

the plaintiff, as well as the other men, called to the craneman to wait a minute until they had the rails straightened out and the rails removed from under the car. The craneman ignored this warning and went ahead with the crane, dropped the magnet into the car and started to move the train which moved the freight car. There is no evidence that the plaintiff knew that the crane operator would disregard this warning after dropping the magnet into the empty freight car. The defense of assumption of risk is an affirmative defense and the burden is upon the defendant. In the case of *Kiefer v. Elgin, J. & E. Ry. Co.,* 351 Ill. 634, the court announced the rule that: " 'The burden of proof of the assumption of risk was upon the defendant, and unless the evidence tending to show it was clear and from unimpeached witnesses, and free from contradiction, the trial court could not be charged with error in refusing to take the question from the jury.' (*Kanawha and M. Railway Co. v. Kerse,* 239 U. S. 576, 36 Sup. Ct. 174.)"

The plaintiff did not assume, nor did he become aware of, the risk after warning the crane operator not to move the car, nor was it obvious to him that the crane operator would disregard his warning and proceed to move the empty freight car. In *Kiefer v. Elgin, J. & E. Ry. Co., supra,* the court, in deciding that case, said: " 'On the facts of the case before us, therefore, plaintiff having voluntarily entered into an employment that required him, on proper occasion, to board a moving train, he assumed the risk of injury normally incident to that operation, other than such as might arise from the failure of the locomotive engineer to operate the train with due care to maintain a moderate rate of speed in order to enable plaintiff to board it without undue peril to himself. But plaintiff had the right to presume that the engineer would exercise reasonable care for his safety, and cannot be

held to have assumed the risk attributable to the operation of the train at an unusually high and dangerous rate of speed until made aware of the danger, unless the speed and the consequent danger were so obvious that an ordinarily careful person in his situation would have observed the one and appreciated the other.' While the evidence for the defendant was that there was no increase in the speed of the engine at the time plaintiff attempted to place his foot on the foot-board of the tender, that evidence is directly contrary to the testimony of plaintiff that at the time he attempted to board the locomotive the engineer suddenly increased the speed, with the result that there was a jerk which caused plaintiff's foot to miss the foot-board. Plaintiff did not assume the risk incident to a sudden increase in speed at the very moment he was attempting to board the locomotive, when the engineer had knowledge that he was about to do so."

Beginning on the 30th day of June, 1931, and continuing to the 29th day of October, 1932, the plaintiff accepted and cashed checks delivered to him by the defendant's claim adjusters on forms set out in the record. The total amount so paid by the defendant to the plaintiff was $988. Defendant offered to prove that the plaintiff had agreed to accept settlement under the Workmen's Compensation Act of Illinois, but this evidence was refused and excluded by the court.

The defendant contends that the plaintiff was estopped to maintain this suit because he accepted numerous payments, totaling $988 under the Workmen's Compensation Act of Illinois, and that the plaintiff's rights are governed by the Illinois Act; that the defendant was ready and willing to complete payment under said act.

The issue in this case is whether or not the plaintiff was engaged in interstate transportation and com-

merce within the terms of the Federal Employers' Liability Act. The defendant is not relieved from liability unless the action is one that cannot be maintained under the provisions of the Federal Liability Act. The Federal Employers' Liability Act, sec. 55, Title 45, Mason's United States Code, provides:

"Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void."

The defendant in order to have the benefit of the deduction of the sums paid to the plaintiff, offered, and the court gave, the following instruction to the jury:

"In computing the amount of your verdict, provided you find for the plaintiff, you should deduct from the amount you ultimately find due the plaintiff from the defendant, as elsewhere explained in these instructions, provided you find any sum due, such sums, if any, as you find the defendant has heretofore paid the plaintiff on account of the alleged injuries resulting from the acts complained of in plaintiff's declaration."

The rule is settled in this State that an employer cannot relieve himself of liability under the Workmen's Compensation Act by contract with his injured employee. In the case of *International Coal & Mining Co. v. Industrial Commission,* 293 Ill. 524, the court said·in part:

"It is well settled in this State that an employer cannot relieve himself of liability under the Workmen's Compensation act by a contract with his employee. (*Tribune Co. v. Industrial Com.,* 290 Ill. 402; *Chicago Railways Co. v. Industrial Board,* 276 Ill. 112; *Wabash Railway Co. v. Industrial Com.,* 286 Ill. 194.)"

Then, again, the Supreme Court of the United States

held that where the facts bring a case within the Federal Employers' Liability Act, such case is governed by that act, and all State laws bearing upon the subject are superseded. This rule is approved in the case of *New York Cent. R. Co. v. Winfield,* 244 U. S. 147, in these words: "Whether and in what circumstances railroad companies engaging in interstate commerce shall be required to compensate their employees in such commerce for injuries sustained therein, are matters in which the nation as a whole is interested, and there are weighty considerations why the controlling law should be uniform and not change at every state line. It was largely in recognition of this that the Employers' Liability Act was enacted by Congress." The fact that the plaintiff accepted compensation under the State law is not a release of a cause of action under the Federal Employers' Liability Act. In the case of *Neumann v. Morse Dry Dock & Repair Co., Inc.,* 255 Fed. 97, the court said:

"The respondent interposed as one defense that the libelant made the application above stated and accepted compensation in full satisfaction of his claim. The libelant now moves to strike out this defense, upon the proposition that the moneys received under the Compensation Law were gratuities, or extrajurisdictional payments. This is opposed by the respondent on the authority of *The Fred E. Sander* (D. C.) 212 Fed. 545. On this theory it is urged that, although no common-law right of recovery exists, although the injured party must proceed in admiralty, and although the Employers' Liability or Workmen's Compensation Act of the various states gives no additional cause of action or right because of the exclusive admiralty jurisdiction under the United States Constitution (*Southern Pac. Co. v. Jensen, supra*), nevertheless the injured person may, by acts showing an election or voluntary contract to accept compensation

under the state law, estop himself, and thereby waive his rights in admiralty. . . .

"Thus a contract which could not be enforced, because the law creating it is unconstitutional, and as to which the courts have no jurisdiction, would, without conscious agreement on the part of the injured party, be left as the only protection of that injured party in collecting any future compensation, and valid as a defense to the employer. . . .

"If this money was paid under mistake of law, there would seem to be no reason for holding that the libelant's right to sue in admiralty had been lost, nor to hold that the libelant must as a condition precedent restore the money paid before suing to recover in admiralty. The case is not one of rescission of contract with a tender of consideration received. *Drobney v. Lukens Iron & Steel Co.*, 204 Fed. 11, 122 C. C. A. 325.

"It is, however, a situation where the money paid under the Compensation Law was on account of the injuries, and in so far as this money came from or belonged to the employer it should be treated as a payment on account, and would, of course, be deductible from the ultimate recovery, if there be any."

There are decisions of courts of appellate jurisdiction that seem to have immediate bearing upon the question: Was the plaintiff placed in a position to make an election of one of two inconsistent remedies? In the case of *Hogan v. New York Central & H. R. R. Co.*, 223 Fed. 890, upon the question of election of remedies, the court said:

". . . it may be well to state that we fail to see how the commencement and subsequent discontinuance of the action in the state court and under the state law could estop the complainant from bringing her action in a federal court. In *Snow v. Alley*, 156 Mass. 193, 195, 30 N. E. 691, 692 (1892), Mr. Justice Holmes,

now of the Supreme Court of the United States, correctly stated the doctrine of election when he said: 'Election exists when a party has two alternative and inconsistent rights, and it is determined by a manifestation of choice. *Metcalf v. Williams*, 144 Mass. 452, 454 (11 N. E. 700). But the fact that a party wrongly supposes that he has two such rights, and attempts to choose the one to which he is not entitled, is not enough to prevent his exercising the other, if he is entitled to that. There would be no sense or principle in such a rule.' "

Concluding as we do that plaintiff is not estopped to maintain this suit because of the acceptance by him of voluntary payments made by the defendant, which payments are provided for by the Illinois Workmen's Compensation Act, the court properly sustained the demurrer of the plaintiff to the defendant's second additional plea as a defense that the plaintiff is estopped to maintain this action.

The court properly excluded Exhibits 1 to 35, inclusive, relative to and filed with the industrial commission bearing upon the claimed settlement by the defendant of plaintiff's claim under the Illinois Workmen's Compensation Act.

As we have already indicated, the plaintiff was not estopped by the acceptance of these payments, and could properly maintain this action under the Federal Liability Act. Our conclusion applies as well to the ruling of the court excluding the evidence of a witness offered by the defendant upon the claimed settlement upon the terms of the Compensation Law of Illinois.

The defendant contends that the trial court erred in refusing to admit in evidence defendant's Exhibit 75, being a copy of the Chicago Switching Committee Tariff No. 22—W, which was a true and authentic copy of the original on file with the commission.

Counsel contend that their purpose in offering this evidence was to establish that the scrap yard, also frequently referred to as the reclamation yard, was considered as an industry, and if admitted, the defendant could argue that the delivery to the industry on its receiving tracks terminated the movement of the car from the point of origin, and in support of their contention cite and rely on the case of *American Ry. Express Co. v. American Trust Co.*, 47 F. (2d) 16.

This case is as to the liability of the express company for the loss of money received by it from the shipper at the shipper's place of business. The decision of the court is to the effect that the express company was not liable under the tariff which was filed with the Interstate Commerce Commission, for the reason that this tariff provided that the shipper was to deliver the money to be shipped to the express company at its office, and this tariff being a part of the contract between the parties, was not waived by a receipt of the money at a bank. The trial court in this case did not err in refusing to admit the exhibit in evidence. There is evidence which tends to establish that the shipment was interstate transportation and not a local one, as contended for by the defendant. From an examination of the exhibit it appears that it is a directory of industries with private or individual side tracks, and the refused exhibit would not have been of aid to the jury in determining the character of the shipment.

There are three instructions that the defendant contends the court erred in refusing to give to the jury:

1. No. 2: ''The court instructs the jury that if you believe from the evidence the injury complained of by the plaintiff was the result of a mere accident, you must find the defendant not guilty.''

2. No. 4: ''The court instructs you that the fact the plaintiff was injured, provided you find plaintiff was

injured, carries with it no presumption of negligence on the part of the defendant, but it is an affirmative fact for the plaintiff to prove by a preponderance of the evidence that the defendant has been guilty of negligence as charged in the plaintiff's declaration. The plaintiff is not entitled to recover by offering evidence to show that the defendant may possibly have been guilty of negligence. The plaintiff must prove by a preponderance of the evidence that the defendant was guilty of some one of the acts of negligence charged in the plaintiff's declaration; and if you believe from all the testimony that the matter is uncertain, and the evidence shows any one of a number of things may have brought about the injury, for some of which the defendant was the proximate cause and for some of which it was not, then your verdict should be 'Not Guilty.' ''

3. No. 5: ''You are instructed that if you do not believe car NKP-70170 was the car which had been unloaded just prior to the time of the alleged accident, and which was being moved at the time of the alleged accident, you are instructed to return a verdict of 'Not Guilty.' ''

In the opinion of the court the first instruction is subject to criticism in that the instruction omits the question of negligence which may have caused the accident. The mere fact that an accident occurred will not in and of itself create a liability, unless caused by the negligence of the defendant, and in order to justify the giving of this instruction to find the defendant not guilty, the question of negligence should have been incorporated.

The second refused instruction is also subject to criticism as to that part of the instruction that the fact that the plaintiff was injured is no presumption of negligence. That may be so, in and of itself, but evidence of injury is a fact, together with the facts of negligence, for a jury to pass upon. The fact that

evidence alone is referred to in the instruction without including all of the facts for the jury, is confusing, for the jury are to consider all of the elements properly before them in considering the negligence of the defendant, and the court in refusing to give this peremptory instruction in the form offered was not error.

As to the last refused instruction offered by the defendant, as above set forth, this is a peremptory instruction to find the defendant not guilty, and it is necessary that this instruction advise the jury to consider all of the facts and circumstances in evidence. There is a conflict in the evidence, and the jury upon the subject must consider all of the facts and circumstances in evidence in arriving at a verdict.

Finally, the question of the amount of the verdict is questioned by the defendant. In the statement of fact this court has set forth the injury sustained by the plaintiff as it appears in the evidence, and no doubt the injuries were a serious disturbance of the plaintiff's anatomy and of a permanent character. The facts as disclosed in the record were considered by the jury upon the question of pain, suffering, inability to work and, in addition, the permanence of the injuries. This court has considered this question, and being one of fact we cannot say the jury was moved by any other consideration than the facts as they appear in the record. In our opinion the verdict is not excessive.

For the reasons stated in this opinion the record is free from reversible error, and the judgment is accordingly affirmed.

*Judgment affirmed.*

WILSON and HALL, JJ., concur.